# EXHIBIT 1

1  JOSEPH P. RUSSONIELLO (CABN 44332)
   United States Attorney
2
   BRIAN J. STRETCH (CABN 163973)
3  Chief, Criminal Division

4  KATHERINE B. DOWLING (CABN 220767)
   Assistant United States Attorney
5      450 Golden Gate Ave., Box 36055
       San Francisco, California 94102
6      Telephone: (415) 436-7200
       Fax: (415) 436-7234
7      E-Mail: Katherine.Dowling@usdoj.gov

8  Attorneys for Plaintiff

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13   UNITED STATES OF AMERICA,          )   No. CR 08-0553 MMC
                                        )
14           Plaintiff,                 )   **UNITED STATES' SENTENCING**
                                        )   **MEMORANDUM**
15       v.                             )
                                        )   Date:      October 21, 2009
16   JOSHUA PRATCHARD,                  )   Time:      2:30 p.m.
                                        )   Judge:     The Hon. Maxine M.
17           Defendant.                 )              Chesney
                                        )
18   _____)

19

20

21

22

23

24

25

26

27

28

GOV'T SENTENCING MEMORANDUM.
CR 08-0553 MMC

## I.   INTRODUCTION

On July 8, 2009, defendant Joshua Pratchard pleaded guilty, without a plea agreement, to a one count indictment charging him with assault resulting in serious bodily injury in violation of 18 U.S.C § 113(a)(6).

The parties and the Probation Office are in agreement that the defendant's guidelines range is 27-33.[1]  The government and the Probation Office are in agreement that a sentence of 33 months in custody, the high end of the guidelines range, is appropriate in this case.  The government and the Probation Office are also in agreement that none of the factors under § 3553(a) warrant a sentence outside of the guidelines range.

This defendant pleaded guilty to assault resulting in serious bodily injury.  The victim of this crime is still living with the pain and suffering caused by the injuries he sustained.  Despite a video that clearly shows Mr. Pratchard stomping repeatedly on the victim's head while he lay on the ground motionless, the defendant has barely accepted responsibility for his actions.  In addition, this defendant has a prior felony for drug distribution.

For these reasons the government joins the Probation Office and asks the Court to impose a sentence in this case at the high end of the guidelines range.

## II.   BACKGROUND AND STATEMENT OF FACTS

On October 13, 2007, the defendant was arrested by United States Park Police for assaulting another individaul on federal property a tthe Oktoberfest celebration at the Pavilion located in Fort Mason.  PSR ¶ 5.  The victim was rendered unconscious and was lying in a pool of his own blood before being transported to the hospital.  *Id.*  A witness was able to capture part of the assault on video which shows Mr. Pratchard repeatedly stomping on the head of an unconscious man before he is pulled away by bystanders.  PSR ¶ 6.  The victim and his friend had been walking through the pavilion at Fort Mason when they were mistaken for another party and assaulted.  PSR ¶ 8.  Among other things, at the hands (or more appropriately foot) of Mr.

---

[1]No objections to this guideline range was filed by defense counsel.

1  Pratchard, the victim suffered a nasal bone fracture requiring surgery, pain, swelling, depression,
2  reduced sense of smell, blocked left nostril and chronic headaches. PSR ¶¶ 9-11 The victim is
3  also at higher risk for epilepsy and Alzheimer's disease in the future according to reports from
4  his neurologist. *Id.*

5  **III.    LEGAL STANDARD AT SENTENCING**

6      **A.    The Court Should First Calculate The Correct Guidelines Range**

7          The Court should impose a sentence sufficient, but not greater than necessary, to reflect
8  the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v.*
9  *Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an
10  appropriate sentence by calculating the correct guidelines range. *Id.* Although the guidelines are
11  not binding, they "reflect a rough approximation of sentences that might achieve section
12  3553(a)'s objectives." *United States v. Rita*, 127 S. Ct. 2456, 2464 (2007).

13      **B.    The Court Should Then Apply The Factors Under § 3553(a) To Determine**
                **Whether The Appropriate Sentence Is Within, Above, Or Below The**
14              **Guidelines Range**

15          The guidelines range will be the starting point and the initial benchmark for the sentence.
16  *Carty*, 520 F.3d at 991. The Court should keep the guidelines range in mind throughout the
17  process, allow the parties to argue for a sentence they believe is appropriate, and consider the
18  factors identified in § 3553(a). *Id.* If the Court imposes a sentence outside the guidelines range,
19  it must consider the extent of the deviation and ensure that its justification for deviating from the
20  range is sufficiently compelling to support the degree of variance in the sentence that it imposes.
21  *Id.* The Court is not required to raise every possible, relevant issue *sua sponte*. *Id.*

22

23  **IV.    THE GUIDELINES RANGE IS 27-33 MONTHS IN CUSTODY**

24      **A.    The Total Offense Level Is 17**

25          The United States agrees with probation that the defendant's final offense level is 17.
26  The defendant's guidelines calculation is as follows:

27  //

28

GOV'T SENTENCING MEMORANDUM.
CR 08-0553 MMC                          -2-

| Base Offense Level | U.S.S.G. § 2A2.2(a) | 14 |
|---|---|---|
| Victim sustained bodily injury | U.S.S.G. § 2A2.2(b)(3)(E) | +6 |
| Adjusted offense level | | 20 |
| Acceptance of responsibility | U.S.S.G. § 3E1.1(a)-(b) | -3 |
| Final offense level | | 17 |

The victim provided information, which is attached to the PSR and discussed in paragraphs 9-15, that supports the above enhancement for sustained bodily injury and also supports the restitution request in the amount of $19,516.11. According to the PSR, in addition to the initial pain and swelling from being stomped on the head several times, the victim in this case informed the probation officer that he "endured headaches which lasted from four to six hours, four to five times a week, over a period of 18 months, as a result of the injuries inflicted by the defendant." PSR ¶ 13. Though more recently botox injections have helped with his headache pain, he also reported to probation that he "has very little or no sense of smell and his left nostril is almost completely blocked." *Id.* He has further been advised to have surgery on his nose which will be expensive, painful and cause him to miss work. *Id.* In addition, medical reports from his neurologist indicate that headaches many months after his injury "portends a poor prognosis" including increased risk for long-term complications from closed head trauma which include post-traumatic epilepsy and Alzheimer's disease. PSR ¶ 11. Understandably, the victim is concerned about what the future holds for him. PSR ¶ 14

### B.   The Criminal History Category Is CHC-II

The United States agrees with the Probation Office that the defendant's Criminal History Category is CHC-II. In 2002, defendant was convicted of distribution of ecstasy while he was in the U.S. Marine Corp for which he received 30 months imprisonment and a bad conduct discharge. PSR ¶ 39. There were additional charges, later dismissed, that are concerning and potentially suggest a pattern with this defendant of failure to accept responsibility for his actions. *Id.* Defendant was charged with wrongful assault and endeavor to influence the testimony. *Id.* The facts relating to both of these dismissed charges involve violent actions and threats of violence on the part of the defendant toward would be witnesses. *Id.* In addition, the defendant

GOV'T SENTENCING MEMORANDUM.
CR 08-0553 MMC                              -3-

1  received three disciplinary reports while in prison all involving physical fights with other

2  prisoners. *Id.*

4  **V.     THE COURT SHOULD IMPOSE A SENTENCE AT THE HIGH END OF THE
5          GUIDELINES RANGE: 33 MONTHS IN CUSTODY AND THREE YEARS OF
        SUPERVISED RELEASE**

6       Although the sentencing guidelines are not mandatory, in cases that are not complex or

7  unusual, the guidelines range will reflect a rough approximation of sentences that might achieve

8  § 3553(a)'s objectives. *United States v. Carty*, 520 F.3d 984, 995-96 (9th Cir. 2008).  A sentence

9  within the guidelines range will "usually be reasonable."  *Id.* at 994 (citing *United States v. Rita*).

10      There are no mitigating factors under § 3553(a) making this case any less serious than

11  other assault cases.  Therefore, a guidelines sentence is reasonable.  The government supports a

12  high end guidelines sentence because of the extent of the victim's injuries, defendant's prior

13  criminal record and his apparent lack of acceptance of responsibility.

14      A sentence within the guidelines range is necessary to account for the nature and

15  circumstances of his offense, and for its seriousness.  18 U.S.C. § 3553(a)(1), (a)(2)(A) (sentence

16  should reflect nature of offense and seriousness of offense).  The nature of this defendant's

17  offense was severe.  As noted above, the victim has medical repercussions that he will be forced

18  to live with for the rest of his life as well as the possibility of increased risk of serious disorders.

19      In addition, the interview of the defendant detailed in the PSR as well as the letter

20  provided by defense counsel, and attached to the PSR, clearly establish that the defendant is still

21  trying to explain his actions rather than take responsibility for his actions.  For example, after

22  stating that he kicked the victim in the head Mr. Pratchard relayed to the probation officer that

23  "based on my military training, I tried to neutralize the threat."  PSR ¶ 20.  No one who has

24  viewed the video of Mr. Pratchard stomping the head of the motionless victim in this case could

25  possibly describe the victim as a "threat" to be "neutralized".  Also, notably, Mr. Pratchard in his

26  written statement puts the term "victim" in quotation marks.  PSR ¶ 19.

27  //

28  //

GOV'T SENTENCING MEMORANDUM.
CR 08-0553 MMC                                    -4-

1    **VI.    CONCLUSION**

2            For the above reasons, the government is in agreement with the recommendation of the

3    Probation Office that this defendant should receive a high end sentence of 33 months, a term of

4    supervised release of 3 years and that he should be ordered to pay restitution to the known victim

5    in the amount of $19,516.11.  The government further requests that the defendant be remanded

6    into custody at the time of sentencing.

7

8    DATED: October 15, 2009                    Respectfully submitted,

9
                                                JOSEPH P. RUSSONIELLO
10                                              United States Attorney

11

12                                                       /s/
                                                KATHERINE B. DOWLING
13                                              Assistant United States Attorney

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 2

```
 1
 2                                          PAGES 1 - 60
 3                  UNITED STATES DISTRICT COURT
 4                NORTHERN DISTRICT OF CALIFORNIA
 5   BEFORE THE HONORABLE MAXINE M. CHESNEY, JUDGE
 6   UNITED STATES OF AMERICA,      )
                                    )
 7            PLAINTIFF,            )
                                    )
 8     VS.                          )          NO. CR 08-0553 MMC
                                    )
 9   JOSHUA JOEL PRATCHARD,         )
                                    )
10            DEFENDANT.            )
     _____)
11
                                    SAN FRANCISCO, CALIFORNIA
12                                  WEDNESDAY, OCTOBER 21, 2009
13                      TRANSCRIPT OF PROCEEDINGS
14   APPEARANCES:
15   FOR PLAINTIFF:          UNITED STATES ATTORNEY
                             450 GOLDEN GATE AVENUE
16                           SAN FRANCISCO, CALIFORNIA  94102
                        BY:  KATHERINE BURKE DOWLING
17                           ASSISTANT UNITED STATES ATTORNEY
18   FOR DEFENDANT:          DAVID LARKIN
                             ATTORNEY AT LAW
19                           1806 BONANZA STREET
                             WALNUT CREEK, CA  94596
20
21
     REPORTED BY:            JAMES YEOMANS, CSR 4039, RPR
22                           OFFICIAL REPORTER
23            COMPUTERIZED TRANSCRIPTION BY ECLIPSE
24
25
```

```
 1   WEDNESDAY, OCTOBER 21, 2009                    2:30 P.M.

 2               (THE FOLLOWING PROCEEDINGS WERE HEARD IN OPEN COURT:)

 3          THE CLERK:  CRIMINAL CASE NUMBER 08-553, UNITED STATES

 4   OF AMERICA VERSUS JOSHUA PRATCHARD.

 5          MR. LARKIN:  GOOD AFTERNOON.

 6          MR. DOWLING:  GOOD AFTERNOON.

 7          KATHERINE DOWLING ON BEHALF OF THE UNITED STATES.

 8          MR. LARKIN:  DAVID LARKIN APPEARING WITH

 9   MR. PRATCHARD.

10          THE PROBATION OFFICER:  GOOD AFTERNOON.

11          ANN SEARLES ON BEHALF OF THE U.S. PROBATION OFFICE.

12          THE COURT:  THANK YOU.

13          THIS MATTER IS ON THE COURT'S CALENDAR FOR JUDGMENT

14   AND SENTENCING.

15          AND I RECEIVED IN CONNECTION WITH THE PROCEEDING THE

16   PROBATION REPORT THAT MS. SEARLES PREPARED THAT'S DATED

17   OCTOBER 9, A MEMORANDUM FROM THE GOVERNMENT, ALTHOUGH, THEY

18   DIDN'T GIVE ME A CHAMBER'S COPY, AND THAT'S DATED OCTOBER 15TH,

19   AND THAT'S ALL I HAVE AT THE MOMENT.

20          WAS ANYTHING ELSE FILED IN CONNECTION WITH THE

21   PROCEEDING?

22          MR. DOWLING:  NOT THAT I'M AWARE OF.

23          MR. LARKIN:  NO, JUDGE.

24          THE COURT:  HAVE YOU HAD ENOUGH TIME TO GO OVER THESE

25   DOCUMENTS WITH YOUR CLIENT AND DISCUSS THEM?
```

1      **MR. LARKIN:**  I HAVE, YOUR HONOR.  THERE ARE SOME OTHER

2    LETTERS THAT I WOULD LIKE TO PRESENT TO THE COURT AND WE HAVE

3    SOME WITNESSES THAT WANT TO BE HEARD.

4      **THE COURT:**  WHAT KIND OF WITNESSES DID YOU HAVE IN

5    MIND?

6      **MR. LARKIN:**  JUDGE, I WAS -- MY UNDERSTANDING IS THE

7    VICTIM IS HERE AND WANTED TO ADDRESS THE COURT, MR. PRATCHARD

8    WISHES TO ADDRESS THE COURT.

9      **THE COURT:**  MR. PRATCHARD HAS THE RIGHT TO BE HEARD,

10   HE HAS A RIGHT OF ALLOCUTION.

11     YOUR UNDERSTANDING IS THAT THE VICTIM WANTS TO BE

12   HEARD AND THIS IS SOMETHING YOU LEARNED FROM MS. DOWLING OR

13   FROM THE VICTIM THEMSELVES?

14     **MR. LARKIN:**  NO, FROM MS. DOWLING, THAT'S NOT THE

15   CASE.

16     **MR. DOWLING:**  THE VICTIM IS PRESENT, BUT HE DOES NOT

17   WISH TO BE HEARD, IS MY UNDERSTANDING.  THAT, PERHAPS, MAY

18   CHANGE IF OTHERS ARE HEARD.  AT THIS JUNCTURE HE'S JUST

19   PRESENT.

20     **THE COURT:**  I DIDN'T INTEND TO HAVE A HEARING WITH

21   PEOPLE GIVING TESTIMONY AT THE TIME OF THE SENTENCING.  SO

22   RIGHT NOW MR. PRATCHARD HAS A RIGHT TO BE HEARD AND I COULD

23   HEAR FROM THE VICTIM IF HE WANTS TO BE HEARD.

24     IS THERE SOMEONE ELSE THAT YOU WERE THINKING OF?

25     **MR. LARKIN:**  JUDGE, PRIMARY PERSON THAT I WANTED TO,

1    WHO IS HERE AND I WANTED TO BE ALLOWED TO SAY SOME WORDS, IS

2    ONE OF THE INDIVIDUALS WHO WAS WITH MR. PRATCHARD AT THE TIME

3    THAT THIS INCIDENT OCCURRED.

4         THERE ARE ACTUALLY TWO, AND I HAVE A LETTER FROM HIM

5    AND I ALSO HAVE A LETTER FROM THE OTHER INDIVIDUAL WHO WAS WITH

6    MR. PRATCHARD.

7         I APOLOGIZE FOR NOT SUBMITTING THOSE TO THE COURT.  I

8    INTENDED TO SUBMIT THEM TO PROBATION, AND MR. PRATCHARD GOT

9    SOMEWHAT DISTRACTED, HIS SON WAS IN INTENSIVE CARE FOR A PERIOD

10   OF TIME AND I WASN'T ABLE TO GET THAT INFORMATION.

11        **THE COURT:**  OKAY.  LET ME JUST STOP YOU FOR A MOMENT.

12   IT'S OFTEN THE CASE THAT THE COURT WILL RECEIVE LETTERS FROM

13   INDIVIDUALS ON BEHALF OF DEFENDANTS WHO ARE FACING SENTENCING,

14   ORDINARILY ATTESTING TO THEIR CHARACTER, EITHER THEIR CHARACTER

15   WITH RESPECT TO THE PARTICULAR TYPE OF CRIME THAT HAS BEEN

16   CHARGED OR THEIR CHARACTER FOR HONESTY, VERACITY AND OTHER

17   MATTERS, BUT NOT AS WITNESSES TO THE EVENT.

18        NOW, WHEN MS. SEARLES PREPARED HER REPORT SHE TOOK

19   CERTAIN FACTS AS A GIVEN BASED ON WHAT SHE BELIEVED TO BE

20   RELIABLE SOURCES OF INFORMATION AND THOSE FACTS ARE

21   INCORPORATED IN THE REPORT.

22        WE DON'T HAVE A TRIAL BECAUSE THE DEFENDANT PLED

23   GUILTY, SO THE COURT HAS NOT SEEN A BODY OF WITNESSES COME IN

24   AND OFFER TESTIMONY AND THERE'S NOTHING UNUSUAL ABOUT THE

25   SITUATION THAT WE HAVE HERE.

```
 1              IN OTHER WORDS, SOMEBODY WHO PLEADS GUILTY THERE MIGHT
 2    BE SOME DISPUTE AS TO HOW THE EVENTS OCCURRED, DESPITE THE FACT
 3    OF GUILT, BUT THAT ORDINARILY WOULD BE IN SOME FASHION DEALT
 4    WITH AT THE PROBATION REPORT LEVEL.
 5              AND RIGHT NOW I DON'T HAVE NECESSARILY THAT TYPE OF
 6    COMPARATIVE EVIDENCE, IF YOU WILL, AND IT'S NOT MY INTENT TO
 7    TRY THIS CASE.
 8              IN OTHER WORDS, IF YOU WANTED THE CASE TRIED, WE COULD
 9    HAVE HAD A TRIAL.  IF THERE ARE CERTAIN FACTS OR CIRCUMSTANCES,
10    WHETHER THERE PROVOCATIONS OR WHATEVER, THAT ARE IN DISPUTE IN
11    SOME WAY OR MAYBE NOT EVEN IN DISPUTE JUST PART OF THE OVERALL
12    CONTEXT OF THE OFFENSE ALLEGED, THEN IT SEEMS THAT WOULD HAVE
13    BEEN BEST HANDLED BY MS. SEARLES.
14              THE ONLY TIME THAT I'M AWARE OF ANYONE WHO HAS A RIGHT
15    TO CALL WITNESSES OTHER THAN VICTIMS IN CERTAIN SITUATIONS IS
16    IF A DEFENDANT HAS BEEN FOUND GUILTY OF A CAPITAL CRIME AND
17    THEY'RE FACING THE DEATH PENALTY, WHICH FORTUNATELY WE DO NOT
18    HAVE ANY KIND OF SITUATION NEAR THAT HERE.
19              SO IF YOU DO NOT FEEL THAT YOU'RE PREPARED TO GO
20    FORWARD TODAY GIVEN WHAT I SAID, BECAUSE I'M NOT GOING TO TAKE
21    TESTIMONY ABOUT HOW THIS EVENT WENT DOWN, AND YOU FEEL THERE'S
22    SOME WAY YOU COULD BETTER PRESENT, AT LEAST, MR. PRATCHARD'S
23    VERSION OF WHAT HAPPENED VERSUS WHATEVER MS. SEARLES HAS SAID
24    AS HOW THE EVENTS UNFOLDED, THEN I COULD HEAR THAT REQUEST.
25    OTHERWISE, I WOULD BE INCLINED TO GO FORWARD.
```

1    **MR. LARKIN:** I UNDERSTAND, JUDGE, AND THAT WOULD BE MY

2    REQUEST. BECAUSE I NOW AM IN POSSESSION OF ALL OF THOSE, AND

3    I'M NOT SUGGESTING I'M DOING SOMETHING THAT IS ASKING YOU TO

4    TRY THE CASE OR WHATEVER, I THINK, I'M PRESENTING FACTORS OF

5    MITIGATION TO EXPLAIN THE CIRCUMSTANCES, AND I THINK IT'S OF --

6    I THINK, IT'S SIGNIFICANT ENOUGH THAT IT'S WORTH A LITTLE BIT

7    OF TIME FOR YOU TO RECEIVE THAT INFORMATION.

8         **THE COURT:** LET ME ASK YOU A COUPLE OF QUESTIONS.

9         **MR. LARKIN:** OKAY.

10        **THE COURT:** ARE ANY OF THOSE FACTORS ALREADY

11   INCORPORATED IN MS. SEARLES' REPORT AND IT'S SIMPLY A QUESTION

12   OF MORE PEOPLE SAYING SOMETHING AS OPPOSED TO ONE PERSON

13   REPORTING THOSE PARTICULAR CIRCUMSTANCES?

14        **MR. LARKIN:** JUDGE, I ATTEMPTED TO EXPLAIN THE

15   CIRCUMSTANCES OF WHAT OCCURRED, AND IN RESPONSE TO THAT

16   PROBATION, MS. SEARLES STATED IT APPEARED THAT WHAT I WAS

17   TRYING TO DO WAS TO JUSTIFY MR. PRATCHARD'S CONDUCT.

18        AND SO, YOU KNOW, I THINK IT, PERHAPS, IF IT'S HEARD

19   DIRECTLY FROM, YOU KNOW, AN INDIVIDUAL'S PERSPECTIVE WHO WAS

20   THERE, I THINK, IT CERTAINLY CAN BE GIVEN MORE WEIGHT.

21        **THE COURT:** THERE IS AN INDIVIDUAL WHO WAS THERE

22   MR. PRATCHARD, AND HE IS WELCOME TO SAY ANYTHING THAT HE FEELS

23   IS APPROPRIATE IN THIS REGARD.

24        I ASSUME THAT THERE WAS SOME KIND OF AN INTERCHANGE

25   BETWEEN THE INDIVIDUALS, MR. PRATCHARD AND THE VICTIM. I DON'T

1  KNOW EXACTLY WHAT THAT WAS, BUT PEOPLE DON'T JUST WALK UP TO

2  PEOPLE WHO ARE LYING ON THE GROUND AND KICK THEM IN THE HEAD.

3      I HAVE SEEN THE VIDEO THAT WAS SUBMITTED BY THE

4  GOVERNMENT AND I ASSUME YOU HAVE ALSO, IT BEGINS FAIRLY LATE IN

5  THE GAME OF THE EVENTS.

6      IN OTHER WORDS, WE DO HAVE THE VICTIM, HE'S ON THE

7  GROUND.  IT STARTS OUT IN A KIND OF BLURRY FASHION.  SOMEBODY

8  IS OBVIOUSLY TRYING TO FILM THIS AT THIS POINT WHEN THEY

9  REALIZE IT'S SOMETHING OTHER THAN, PERHAPS, THE ORDINARY AND

10  YOU GET MR. PRATCHARD KICKING THE VICTIM IN WHAT LOOKS LIKE HIS

11  HEAD WHILE HE'S DOWN.

12      HE'S NOT WEARING STEEL TOED WORK BOOTS, HE APPEARS TO

13  BE WEARING SNEAKERS OR SOMETHING OF THAT NATURE, BUT THIS IS

14  STILL VERY SERIOUS BEHAVIOR.  HE'S PULLED AWAY AND THEN ALL

15  KIND OF PEOPLE ARE JUST BENDING OVER THE VICTIM WHO IS OUT COLD

16  AT THE TIME, HE'S NOT MOVING, AND THAT'S THE END OF THE VIDEO.

17      OKAY.  HOW IT STARTED, WHO COULD HAVE CALLED SOMEBODY

18  WHAT, EVERYBODY AROUND WHO IS THERE WHEN THIS EVENT HAPPENS HAS

19  GOT A LARGE SERVING OF BEER IN FRONT OF THEM AND MOST OF THEM

20  WERE SITTING THERE WHEN THE KICKING OCCURRED.

21      THAT MEANS THAT SOMETHING WENT ON THAT NOBODY EVEN

22  PAID ALL THAT MUCH ATTENTION TO OR IT HAD CALMED DOWN BY THE

23  TIME MR. PRATCHARD CAME BACK, BUT IT'S -- THERE'S A LOT OF

24  DRINKING GOING ON THERE, I ACCEPT THAT.

25      I DON'T KNOW ALL THAT HAPPENED BEFORE.  THE ARGUMENT

1   FROM THE GOVERNMENT IS YOU GOT A GUY WHO'S DOWN AND OUT AND YOU

2   DON'T KICK HIM IN THE HEAD AND POSSIBLY KILL HIM IN THE

3   PROCESS, THAT'S REALLY THE CASE.

4          SO IF MR. PRATCHARD WANTS TO EXPLAIN BEYOND AND, I

5   THINK, ISN'T THERE MATERIAL IN THE PROBATION REPORT REGARDING

6   HIS EXPLANATION?

7          **MR. LARKIN:**  THERE IS, JUDGE.

8          **THE COURT:**  I HAD A COUPLE OF QUESTIONS HERE BECAUSE

9   IT SAID IN MS. SEARLES' REPORT, FOR EXAMPLE, THE VICTIM

10  ADMITTED TO HOSPITAL STAFF TO DRINKING SIX TO EIGHT 32 OUNCES

11  OF BEER ON THE DAY OF THE INCIDENT.

12         NOW, A CUP IS EIGHT OUNCES, 32 OUNCES IS LIKE FOUR

13  CUPS, THAT WOULD BE, I BELIEVE, A QUART, AND NOW YOU'RE SAYING

14  THAT THE VICTIM ADMITTED TO DRINKING EIGHT QUARTS, WHICH WOULD

15  BE 2 GALLONS OR SOMETHING LIKE THAT.

16         I DON'T HAVE TO FIGURE IT OUT FROM MY OLD SCHOOL DAYS,

17  BUT LET'S SAY 2 GALLONS OF BEER HIMSELF, THAT'S YOUR

18  UNDERSTANDING, MS. SEARLES?

19         **THE PROBATION OFFICER:**  YES, YOUR HONOR.

20         **THE COURT:**  OKAY.  I DON'T KNOW WHAT MR. PRATCHARD'S

21  VIEW WAS ABOUT HIS OWN CONSUMPTION.

22         **MR. LARKIN:**  JUDGE, HE STATED TO PROBATION THAT HE HAD

23  JUST ARRIVED THERE AND HADN'T CONSUMED ANY ALCOHOL.

24         **THE COURT:**  OKAY.  SO HE'S SOBER AND THE VICTIM IS

25  FALLING DOWN DRUNK.  OKAY.  DOES THAT HELP?  I DON'T KNOW.  NOT

1   NECESSARILY.

2       **MR. LARKIN:**  JUDGE, WHAT I THINK IT DOES IS HELP

3   SOMEWHAT EXPLAIN HOW THE SEQUENCE OF EVENTS CAME DOWN.

4       **THE COURT:**  WE'RE NOT GOING TO HAVE WITNESSES, SO I'M

5   NOT SURE IF WE SHOULDN'T JUST GO AHEAD TODAY.  I DON'T WANT TO

6   STOP YOU FROM PRESENTING WHAT YOU THINK YOU CAN, BUT I DON'T

7   KNOW THAT THIS IS THE TIME TO HAVE MS. SEARLES NOW CHANGE HER

8   REPORT.

9       IN OTHER WORDS, SHE ALREADY PREPARED THE REPORT.  YOU

10  COULD SUBMIT LETTERS, I GUESS.

11      **MR. LARKIN:**  OKAY, JUDGE.  I WASN'T ASKING, YOU KNOW,

12  I WASN'T SUGGESTING MS. SEARLES CHANGE HER REPORT.  I DON'T

13  THINK THAT WHAT I HAVE HERE IS SOMETHING THAT WOULD DO THAT.

14      I MEAN, I'VE LETTERS FROM, CHARACTER REFERENCE

15  LETTERS, AND THEN I HAVE TWO INDIVIDUALS WHO WERE THERE THAT

16  WERE WITNESSES TO WHAT HAPPENED.  SO I JUST --

17      **THE COURT:**  ASSUME THAT TWO INDIVIDUALS WOULD, IN YOUR

18  VIEW, CORROBORATE WHAT MR. PRATCHARD SAID ABOUT HOW IT

19  HAPPENED?

20      **MR. LARKIN:**  YEAH, ACTUALLY STARTED WITH ONE OF THE

21  OTHER INDIVIDUALS AND ONE OF MR. PRATCHARD'S FRIENDS, AND THE

22  OTHER VICTIM AND THE GROUP THAT HE WAS WITH, AND MR. PRATCHARD

23  THEN GOT INVOLVED AFTER THE INITIAL PROBLEMS HAD STARTED WITH

24  THIS OTHER INDIVIDUAL MR. PRATCHARD WAS WITH.

25      SO, YOU KNOW, I THINK THAT SPEAKS TO MY ARGUMENT THAT

1   WHEN MR. PRATCHARD CAME IN IT WAS CONDUCT THAT STARTED OUT IN

2   DEFENSE OF OTHERS AND THEN IN SELF-DEFENSE.

3          AND IT'S CERTAINLY NOT ARGUED HE WENT BEYOND THE

4   BOUNDS OF SELF-DEFENSE WHEN HE KICKED THIS INDIVIDUAL WHO WAS

5   ON THE GROUND, BUT IT'S NOT JUST AN UNPROVOKED ASSAULT AND, I

6   THINK, HOW IT ALL CAME ABOUT IS SIGNIFICANT IN TERMS OF

7   MITIGATION.

8          **THE COURT:**  WELL, HE IS MORE THAN WELCOME, YOUR

9   CLIENT, TO DESCRIBE THOSE EVENTS.

10          **MR. LARKIN:**  OKAY.

11          **THE COURT:**  LET'S JUST GO BACK FOR A MOMENT.  THE

12  LETTERS THAT YOU SAY YOU HAVE THAT YOU DIDN'T SUBMIT EARLIER

13  FOR THE REASONS YOU DESCRIBED, DO YOU -- ARE THESE LETTERS THAT

14  DESCRIBE THE EVENT?

15          ARE THEY LETTERS THAT GO TO HOW MR. PRATCHARD HAS

16  OTHERWISE CONDUCTED HIS LIFE?

17          **MR. LARKIN:**  THAT'S WITH THE EXCEPTION OF LETTERS FROM

18  BOTH HIS MOTHER AND FATHER AND ANOTHER INDIVIDUAL THAT ARE

19  CHARACTER LETTERS I WAS JUST GIVEN TODAY AND --

20          **THE COURT:**  I'M CERTAINLY WILLING TO ACCEPT THOSE AND

21  READ THEM TO AVOID EVERYONE HAVING TO COME BACK.  WHO ARE ALL

22  THESE PEOPLE?  ARE THESE PEOPLE IN THE COURTROOM SOMEONE THAT

23  --

24          **MR. LARKIN:**  THEY'RE HERE IN SUPPORT OF MR. PRATCHARD.

25          **THE COURT:**  OKAY.  WELL, THEN I'M ASSUMING THAT ALL

1  THINGS BEING EQUAL YOU WOULD RATHER GO FORWARD TODAY, IF YOU

2  COULD, RATHER THAN HAVE ALL THESE PEOPLE, APPARENTLY TOOK TIME

3  FROM THEIR OTHER ENDEAVORS TO HAVE TO COME BACK AGAIN OR NOT BE

4  ABLE TO COME BACK AGAIN.  IF AT ALL POSSIBLE.

5         I WAS JUST CHECKING SOMETHING RIGHT NOW THAT . . . I

6  JUST WANTED TO DOUBLE-CHECK IN A CASE SUCH AS THIS BOTH THE

7  VICTIM AND MR. PRATCHARD ARE ENTITLED TO BE HEARD IF THEY WISH

8  TO BE BEFORE THE COURT WOULD IMPOSE ANY SENTENCE.

9         THIS IS RULE 32 THE FEDERAL RULES OF CRIMINAL

10  PROCEDURE, AND I JUST WANTED TO CHECK ONE MATTER, BUT THERE'S

11  NO OTHER INDICATION THAT OTHER THAN COUNSEL OF PARTY OR AN

12  INDIVIDUAL WHO'S ENTITLED TO SPEAK.

13         I DON'T WANT TO ASSUME SOMETHING THEN FIND OUT MY

14  ASSUMPTION ISN'T CORRECT.  I THINK THAT'S PRETTY MUCH IT.  YOU,

15  MS. DOWLING, MR. PRATCHARD AND THE VICTIM, SO LET'S GO TO THE

16  LETTERS.

17         DID YOU WANT TO HAND THOSE UP TO ME OR?

18         **MR. LARKIN:**  YES.

19         **THE COURT:**  OKAY.  NOW, ARE THESE THE ORIGINALS?  ARE

20  THEY COPIES?  WHAT DO I HAVE HERE?

21         THERE'S QUITE A FEW.  ONE IS FROM, I GUESS, AN

22  EMPLOYER, SOMEONE WHO BEEN AT THE OKTOBERFEST WHO SPONSORS THIS

23  EVENT ANYWAY AND WHY?

24         DOESN'T SOUND LIKE SOMETHING WE REALLY NEED.  THIS IS

25  JOEL PRATCHARD, MR. PRATCHARD'S FATHER.  I'M JUST LOOKING

1    THROUGH TO SEE WHO THE PEOPLE ARE WHO WROTE THESE.

2         ALSO, WENT TO THE OKTOBERFEST.  THE DEFENDANT'S MOTHER

3    AS YOU MENTIONED THE HEALTH CARE PROFESSIONAL.  OKAY.  SO I CAN

4    TAKE A FEW MINUTES GIVE THE REPORTER A CHANCE TO CATCH HIS

5    BREATH.

6         AS FAR AS THESE LETTERS THEY ARE NOT CURRENTLY IN ANY

7    WAY A FORMAL PART OF THE RECORD AND I'M WILLING TO LOOK AT

8    THEM, BUT IF YOU WANT THEM FILED AS A FORMAL PART OF THE RECORD

9    YOU WOULD NEED TO TAKE THE LETTERS AND PUT THEM UNDER SEPARATE

10   COVER AND DESCRIBE THEM AS SOMETHING SUCH AS CORRESPONDENCE

11   SUBMITTED IN CONNECTION WITH SENTENCING HEARING ON X DATE, AND

12   FOR THE RECORD THERE FROM BELINDA LOPEZ, DOTTY PRATCHARD, JANE

13   HEAT, BRIT VAN BULLEN, JOEL PRATCHARD, ANDREW MCINTIRE, THIS

14   ONE IS NOT SIGNED.

15        **MR. LARKIN:**  WHICH ONE IS THAT, JUDGE?

16        **THE COURT:**  I'LL GIVE IT BACK TO YOU SO YOU CAN LOOK

17   AT IT, RENE DEROSHAE AND I DON'T KNOW IF THIS PERSON IDENTIFIED

18   THEMSELVES BY NAME ALONG THE WAY.  BUT THEY'RE FRIEND OF MR.

19   PRATCHARD.  WANT TO TAKE A LOOK AT IT, IF THEY'RE HERE THEY

20   COULD SIGN THE LETTER.

21        **MR. LARKIN:**  IS HERE AND IT'S FROM ANDREW WHO IT'S

22   ATTACHMENT TO A LETTER THAT --

23        **THE COURT:**  OKAY.  IF THAT INDIVIDUAL WANT TO SIGN

24   THEIR LETTER THEY CAN DO IT.  AND THEN YOU CAN HAND IT TO ME

25   AND THEN YOU SHOULD SUBMIT THESE UNDERCOVER OF SOME SORT.  MAY

1    AS WELL TAKE THE SIGNED COPY.

2            SOMETIMES PEOPLE WILL SAY THEIR NAME UP AT THE TOP AND

3    THEN THAT MIGHT REALLY NEED, PERHAPS, TO HAVE IT SIGNED.  SO

4    THE LETTER I WAS JUST REFERRING TO IS FROM, MAYBE THAT'S JUST A

5    COPY OF MR. MCINTIRE'S OTHER ONE.  NO, HE WROTE TWO.  OKAY.  SO

6    AS I WAS GOING THROUGH THESE, MS. DOWLING, YOU DID FIND U.S.

7    COPIES OF THEM?

8            **MR. LARKIN:**  SHE DOESN'T HAVE EVERYTHING, JUDGE.  I

9    GAVE HER WHAT I HAD AT THE TIME, BUT.

10           **THE COURT:**  WHAT HAVE YOU GOT?

11           **MR. DOWLING:**  SO I WAS PROVIDED THESE LETTERS RIGHT

12   BEFORE THE HEARING.  I HAVE A LETTER FROM DOTTY PRATCHARD, JOEL

13   PRATCHARD.

14           **THE COURT:**  ONE SECOND.  YOU HAVE JOEL PRATCHARD, YOU

15   HAVE DOTTY PRATCHARD, WHO ELSE DO YOU HAVE?

16           **MR. DOWLING:**  BRIT VAN BULLEN, I HAVE A LETTER FROM

17   BELINDA LOPEZ PH.D. AND A LETTER FROM JANE HEAT.

18           **THE COURT:**  WHAT YOU'RE MISSING IS THE TWO PIECES OF

19   CORRESPONDENCE FROM ANDREW MCINTIRE AND ALSO A LETTER FROM

20   RENE, I THINK, I'M NOT SURE HOW TO PRONOUNCE IT, BUT I'M SAYING

21   DEROSHAE.

22           AND I'LL ASK THAT AT THE BREAK THAT MS. LUCERO MAKE

23   YOU A COPY OF THESE, SO THAT YOU'LL HAVE THE EXTRA THREE, AND

24   THEN WE'LL TAKE 10 MINUTES.

25           **MR. LARKIN:**  JUDGE, MR. PRATCHARD WAS ESSENTIALLY

1   GOING TO READ A WRITTEN STATEMENT THAT HE WROTE AND, I THINK,

2   PERHAPS, IN THE INTEREST OF TIME IT WOULD BE FASTER TO PROVIDE

3   THAT TO YOU AND A COPY TO COUNSEL.

4           **THE COURT:**  IF HE WOULD LIKE TO READ THE STATEMENT,

5   I'M NOT TRYING TO STOP HIM FROM MAKING ANY KIND OF A STATEMENT,

6   IF HE WANTS TO HAND IT IN AS WELL HE CAN.  BUT IF HE WOULD FEEL

7   BETTER JUST READING IT, THAT'S FINE.

8           **MR. LARKIN:**  HE'S HAPPY TO HAVE YOU READ IT.

9           **THE COURT:**  THEN THAT'S ANOTHER DOCUMENT THAT NEEDS TO

10  BE COPIED AND THAT ONE MS. LUCERO WILL NEED TWO COPIES OF.

11  JUST ONE COPY.

12          SO WE'LL TAKE 10 MINUTES AT THIS TIME.

13                      (RECESS TAKEN.)

14                  (PROCEEDINGS RESUMED.)

15          **THE CLERK:**  RECALLING CRIMINAL CASE NUMBER 08-553,

16  UNITED STATES VERSE OF AMERICA VERSUS JOSHUA PRATCHARD.

17          **THE COURT:**  ALL RIGHT.  RETURNING THEN TO THE RECORD

18  OF THIS MATTER.  I READ THE LETTERS THAT WERE SUBMITTED ON

19  BEHALF OF MR. PRATCHARD AND ALSO HIS OWN STATEMENT.

20          AND, MS. DOWLING, HAVE YOU HAD AN OPPORTUNITY TO READ

21  THOSE ADDITIONAL MATERIALS AS WELL?

22          **MR. DOWLING:**  I HAVE, YOUR HONOR.  THANK YOU.

23          **THE COURT:**  WELL, THEN IF WE ARE GOING TO BE

24  PROCEEDING AT THIS TIME I SUPPOSE THE BEST THING IS JUST TO

25  TURN TO ONE OF YOU AND ALLOW YOU TO MAKE THE POINTS THAT YOU

1   WOULD LIKE TO MAKE, AND THEN HEAR FROM THE OTHER OR TO HEAR

2   FROM THE WITNESS IF YOU WANTED.

3           IF HE WANTS TO SPEAK, I DON'T KNOW IF HE DOES, HE

4   WOULD LIKE TO HAVE HIM FIRST IF HE DOES.

5           **MR. DOWLING:**  THE VICTIM HAS EXPRESSED, HE'S EXPRESSED

6   HIS STORY THROUGH PROBATION, NOT INTERESTED IN SPEAKING.

7   HOWEVER, THAT MAY CHANGE AFTER HEARING, SO IF WE COULD REVISIT

8   THAT.

9           IF WE COULD CLARIFY ONE POINT FOR YOUR HONOR.  I WAS

10  SPEAKING WITH MS. SEARLES DURING THE BREAK AND THERE WAS A

11  CONVERSATION ABOUT THE AMOUNT OF ALCOHOL THAT THE VICTIM HAD

12  DURING THE OKTOBERFEST, AND IN THE PROBATION REPORT IT'S

13  ACTUALLY A COMMENT THAT MS. SEARLES PICKED UP FROM THE MEDICAL

14  RECORD AS OPPOSED TO A COMMENT IN SPEAKING WITH THE VICTIM HE

15  MADE DIRECTLY TO HER.

16          IN OTHER WORDS, THE VICTIM BELIEVED HE DRANK TWO OR

17  THREE OF THE 32-OUNCE CONTAINERS DURING THE COURSE OF THE DAY

18  AS OPPOSED TO THE SIX TO EIGHT OR 2 GALLONS.  SO JUST TO

19  CLARIFY IT WAS ABOUT A THIRD OF THE AMOUNT THAT'S IN THE

20  REPORT.

21          **THE COURT:**  SO HE HAD TWO OR THREE OF THE 32-OUNCE

22  GLASSES?

23          **MR. DOWLING:**  CORRECT.

24          **THE COURT:**  NOW, DID YOU WANT TO GO FORWARD THEN AT

25  THIS POINT, MS. DOWLING?

1      **MR. DOWLING:** EITHER WAY IS FINE.

2      **THE COURT:** WHY DON'T YOU BEGIN.  I HAVE YOUR

3  MEMORANDUM.

4      **MR. DOWLING:** JUST -- SO THEN JUST TO BEGIN, SINCE

5  WE'RE ON THE TOPIC OF THE LETTERS, TO CONTINUE THERE, I THINK,

6  TWO OF THE LETTERS FALL INTO THE CATEGORY OF PERCIPIENT

7  WITNESS, AND I THINK AT THIS JUNCTURE THOSE SHOULD NOT BE READ.

8  THE REST OF LETTERS FALLEN FROM THE CHARACTER BUCKET, I THINK,

9  WOULD BE APPROPRIATE.

10      BUT WITH REGARD TO THE PERCIPIENT WITNESS LETTERS,

11  NEITHER OF THESE INDIVIDUALS HAS BEEN -- THE OPPORTUNITY -- I

12  DON'T HAVE THE OPPORTUNITY TO DISCUSS WITH THEM OR PUT THEM ON

13  THE STAND, ET CETERA, AND I THINK WE HAVE THE DEFENDANT'S

14  DISCUSSIONS WITH MS. SEARLES, MR. PRATCHARD DISCUSSION WITH HER

15  AS TO WHAT HAPPENED AT THE EVENT.  YOU CAN GET THE STORY WHAT

16  HAPPENED AT THE EVENT FROM HIM.

17      THERE IS DISAGREEMENT ABOUT WHAT HAPPENED SUBJECT TO

18  MISUNDERSTANDING, I DON'T KNOW, BUT IN MY CONVERSATION WITH THE

19  VICTIM AND HIS FRIEND, AND THIS INFORMATION IS IN MS. SEARLES'

20  REPORT, THEY BELIEVE THEY WERE -- IT WAS A MISTAKEN IDENTITY,

21  AND THAT THE VICTIM AND HIS FRIEND JUST TWO PEOPLE WERE WALKING

22  THROUGH THE OKTOBERFEST AND THAT THEY WERE JUMPED BY ANOTHER

23  GROUP OF PEOPLE.

24      OBVIOUSLY, MR. PRATCHARD PUT FORTH IN HIS STORY THAT

25  HE BELIEVES HE WAS COMING TO THE RESCUE OF HIS FRIEND WHO WAS

```
1   BEING JUMPED BY A LARGE GROUP OF OTHER PEOPLE.  SO THERE'S
2   DEFINITELY DISAGREEMENT AS TO HOW THIS WHOLE FRACAS BEGAN.
3        SO, I THINK, IF WE FOCUS MORE ON THE VIDEO ASPECT AND
4   WHAT WE SAW AND MR. PRATCHARD, IS WITH THE UNDERSTANDING THAT
5   HE'S PUTTING FORTH INFORMATION OF HOW HE BELIEVED IT BEGAN,
6   THAT'S NOT A CERTAINTY OF HOW THIS WHOLE DISAGREEMENT DID
7   BEGIN, THERE'S NO CERTAINTY ON THIS AT THIS JUNCTURE.
8        THE COURT:  I SUPPOSE, THE CIRCUMSTANCES AS DESCRIBED
9   BY EVERYONE EXCEPT, PERHAPS, MR. PRATCHARD SEEM TO BE MISSING
10  SOME CONNECTORS.
11       IN OTHER WORDS, PEOPLE ARE WALKING THROUGH A CROWDED
12  AISLE, DID SOMEBODY BUMP INTO SOMEONE AND SOMEBODY SAYS WATCH
13  WHERE YOU'RE GOING, AND THE OTHER ONE TURNS AROUND AND BECOMES
14  CONFRONTATION AND TURNS INTO A FIGHT, I DON'T KNOW.
15       THE IDEA THAT THEY WERE MISTAKEN, THE VICTIM AND HIS
16  FRIEND WERE MISTAKEN ABOUT MR. MCINTIRE BEING PART OF SOME
17  GROUP THAT APPARENTLY ASSAULTED THE VICTIM AND HIS FRIENDS
18  EARLIER, I DON'T KNOW, THAT DOESN'T MAKE A LOT OF SENSE EITHER,
19  FRANKLY.
20       IF YOU ACCEPT MR. MCINTIRE'S STATEMENT THAT HE WAS
21  JUST WALKING THROUGH THERE'S, OBVIOUSLY, A CONFRONTATION,
22  THAT'S TIGHT QUARTERS, PEOPLE ARE DRINKING.  AS I SAY, I DON'T
23  KNOW WE NEED THE SO-CALLED OCTOBER FESTIVAL.
24       BUT IN ANY EVENT, IT'S A RECIPE FOR PROBLEMS.  AND AS
25  IT TURNED OUT ONE WAS PRODUCED.  I DON'T THINK THAT I CAN
```

1  TOTALLY ARBITRATE FROM THE MATERIAL THAT I HAVE EXACTLY HOW

2  THIS STARTED AND WHETHER -- I DON'T ACTUALLY HAVE THE VICTIM'S

3  NAME BECAUSE HE'S BEEN DESCRIBED AS DS IN THE PLEADING AND I

4  THINK JUST THE VICTIM.  DO I HAVE HIS NAME IN HERE OR NOT?

5           I DON'T KNOW THAT I DO AND HE MAY NOT WANT IT.  UNLESS

6  HE SPEAKS, MAYBE A MATTER OF PUBLIC RECORD, BUT THE POINT IS

7  THAT I'LL JUST KEEP CALLING HIM THE VICTIM.

8           **MR. DOWLING:**  I WON'T GIVE HIS NAME, BUT I WILL

9  INTRODUCE THE VICTIM.  YES, IN THE SECOND ROW.  THE VICTIM IN

10 THIS MATTER.

11          **THE COURT:**  GOOD AFTERNOON.  DID SOMEBODY GRAB

12 MR. PRATCHARD AS HE CAME FORWARD TO HELP HIS FRIEND?

13          WAS THAT PERSON THE VICTIM OF THE CRIME CHARGED?

14          WAS IT SOMEBODY ELSE?

15          WHO TOOK A SWING AT MR. PRATCHARD?  IF SOMEBODY DID.

16          HOW DID THE VICTIM GET ON THE GROUND?

17          ACCORDING TO MR. PRATCHARD SOME KIND OF MUTUAL COMBAT

18 STRUGGLE THEY BOTH ENDED UP ON THE GROUND.  SOMEHOW

19 MR. PRATCHARD GOT UP AND THE VICTIM WAS STILL ON THE GROUND.

20 YOU KNOW, IT'S NOT REALLY TOTALLY CLEAR HERE.

21          I THINK, MR. PRATCHARD'S ARGUMENT THROUGH COUNSEL AND

22 WHATEVER HE'S PRESENTED, IS THAT HOWEVER IT STARTED HE DIDN'T

23 JUST WALK UP TO SOMEBODY LYING ON THE GROUND AND KICK HIM IN

24 THE HEAD.

25          IN OTHER WORDS, HE'S DESCRIBING THERE WAS SOME KIND OF

1    EVENT THAT OCCURRED FIRST, I WILL NEVER KNOW EXACTLY WHAT

2    STARTED, BUT SOMETHING HAPPENED.

3            SO TAKING THAT AS A GIVEN, I THINK, THEN YOU COULD

4    MAKE WHAT ARGUMENT YOU FEEL WOULD BE APPROPRIATE BECAUSE WHAT

5    WE DO KNOW IS WHATEVER ON THE VIDEO THE MEDICAL CONSEQUENCES OF

6    THE ENCOUNTER FOR THE VICTIM SERIOUS INJURY, POTENTIALLY LIFE

7    THREATENING AS TIME GOES ON.

8            AND SO THAT'S WHAT I SUGGEST THAT YOU FOCUS ON AS BEST

9    YOU CAN IN THAT RESPECT, BECAUSE WE'RE NOT GOING TO KNOW, I

10   DON'T THINK, UNLESS WE HAVE A TRIAL AND A JURY DECIDE WHO DID

11   WHAT WHEN HOW FIRST.

12           **MR. DOWLING:**  SO IF WE START WITH OUR FOCUS POINT ON

13   THE VIDEO, WHICH THE PARTIES HAVE BOTH SEEN, YOUR HONOR

14   INDICATED THAT YOU HAD THE OPPORTUNITY TO VIEW THE VIDEO AS

15   WELL?

16           **THE COURT:**  I DID.

17           **MR. DOWLING:**  IT'S WHAT YOU SEE ON THAT VIDEO IS VERY

18   SCARY.  YOU SEE AN INDIVIDUAL BEING STAMPED IN THE HEAD

19   NUMEROUS TIMES.  AS WE KNOW FROM THE MEDICAL REPORTS THAT HAVE

20   BEEN PROVIDED TO PROBATION, THE MEDICAL CONSEQUENCES OF THAT

21   FACE STOMPING, FOR LACK OF A BETTER TERM, HAVE BEEN SEVERE,

22   BOTH AT THE TIME THE PAIN SUFFERED IN THE INSTANCE AND THE

23   AFTERMATH, AND CURRENTLY THE VICTIM IS STILL SUFFERING FROM THE

24   REPERCUSSIONS OF BEING STOMPED IN THE FACE.

25           AND THE MEDICAL REPORTS ALSO INDICATE THAT NOT ONLY

1   DOES HE HAVE WHAT HE PREVIOUSLY SUFFERED, WHAT HE'S CURRENTLY

2   SUFFERING, HE HAS THE CONSEQUENCES POTENTIALLY WHAT HE COULD

3   SUFFER IN THE FUTURE AN INCREASE INSTANCE OF ALZHEIMER AND

4   EPILEPSY.  HE'S HIGHER RISK FOR THOSE TWO BECAUSE OF THE CLOSED

5   HEAD TRAUMA HE SUFFERED AT THE FOOT OF THE DEFENDANT IN THIS

6   CASE.

7            SO COMBINE THAT WITH LOOKING AT MR. PRATCHARD'S PRIOR

8   RECORD, IT'S NOT A CLEAN RECORD, WE HAVE A HISTORY HERE.  THIS

9   IS NOT SOMEONE WHO CAME INTO OKTOBERFEST AND GOT IN A FIGHT AND

10  THIS IS ONE TIME EXPERIENCE, HE HAS A FAIRLY IN DEPTH RECORD.

11           HE WAS DISCHARGED, HE HAD A BAD CONDUCT DISCHARGE FROM

12  THE MILITARY FOR DRUG DEALING AND WRAPPED UP IN THOSE CHARGES

13  WHICH HE WAS CONVICTED OF THERE'S ADDITIONAL TESTIMONY FROM

14  ADDITIONAL PEOPLE THAT HE THREATENED THEM IF THEY WERE TO COME

15  FORWARD WITH THEIR STORY.

16           ONE INDIVIDUAL STATED THAT HE WAS OUTSIDE HIS HOME

17  WITH A BASEBALL BAT AT ONE POINT.  SO FROM THE RECORD IT

18  APPEARS THAT NOT ONLY DO WE HAVE SOMEONE WHO HAS A CRIMINAL

19  RECORD, BUT THERE'S ALSO ADDITIONAL NOISE THAT'S WOULD SUGGEST

20  THAT MR. PRATCHARD HAS AN ANGER MANAGEMENT PROBLEM, AND THAT

21  THAT ANGER BROUGHT HIM TO STOMP ON THE FACE OF A PERSON WHO WAS

22  LAYING ON THE GROUND MOTIONLESS.

23           AND THAT IS CONCERNING AND FOR THOSE ACTIONS AND

24  WRAPPING IN HIS PRIOR RECORD FOR THE SERIOUSNESS OF THIS CRIME

25  AND THE MEDICAL CONSEQUENCES THE VICTIM IS GOING TO FACE, FACES

1    NOW AND CONTINUES TO FACE IN THE FUTURE, THE GOVERNMENT IS

2    RECOMMENDING THE SENTENCE THAT PROBATION IS ALSO RECOMMENDING,

3    WHICH SENTENCE OF 33 MONTHS.

4            AND THAT'S FROM A GUIDELINE CALCULATIONS AND THAT'S

5    THE HIGH END OF THE GUIDELINE CALCULATIONS FOR THIS, FOR THESE

6    FACTS IN THIS CASE.

7            **THE COURT:**  AND, MS. SEARLES, YOU HAD AN OPPORTUNITY

8    OR NOT TO SEE THESE LETTERS THAT WERE SUBMITTED MORE RECENTLY?

9            **THE PROBATION OFFICER:**  YES, I DID DURING THE RECESS.

10           **THE COURT:**  IS YOUR RECOMMENDATION CHANGED AT ALL BY

11   THESE RECENT SUBMISSIONS?

12           **THE PROBATION OFFICER:**  NO, IT HASN'T, YOUR HONOR.

13           **THE COURT:**  THANK YOU.  THEN I'M GOING TO TURN TO

14   COUNSEL FOR MR. PRATCHARD AT THIS TIME.

15           **MR. LARKIN:**  WELL, YOUR HONOR, DOESN'T SURPRISE ME

16   THAT U.S. ATTORNEY WOULD JUST LIKE YOU TO LOOK AT THE VIDEO AND

17   FOCUS ON THAT, BUT THE VIDEO JUST SHOWS THE LAST FEW SECONDS OF

18   AN INCIDENT THAT OCCURRED.

19           AND WHAT OCCURRED PRIOR TO THAT, WHILE IT MAY NOT BE

20   POSSIBLE TO TOTALLY RESOLVE WHAT HAPPENED, YOU HAVE A SITUATION

21   WHERE MR. PRATCHARD AND HIS FRIENDS HAD JUST COME INTO THE

22   OKTOBERFEST.

23           THE VICTIM IN THE CASE HAD BEEN THERE BY ALL ACCOUNTS

24   AND ALL THE MEDICAL RECORDS IS EXTREMELY INTOXICATED, AND AN

25   ASSAULT OCCURS AND FOR CLARIFICATION THE VICTIM HAD NO

1   RECOLLECTION OF WHAT, IT'S NOT A DISPUTE WHERE HE HAS ANY

2   INDEPENDENT RECOLLECTION OF WHAT TOOK PLACE.

3        HE CAME IN WITH A FRIEND THAT WAS THERE WHO WAS ALSO

4   INJURED, WHO WAS INVOLVED IN THAT ALTERCATION AND, YOU KNOW,

5   AND IT'S THAT INDIVIDUAL APPARENTLY TRIED TO CHARACTERIZE THIS

6   AS JUST AN UNPROVOKED ASSAULT, WHICH I DON'T BELIEVE MAKES ANY

7   SENSE.

8        I BELIEVE THIS WAS PRECIPITATED BY AND DRIVEN BY HIS

9   EXTREME STATE OF INTOXICATION, AND I THINK THAT THAT IS

10  SIGNIFICANT.  BECAUSE WHEN YOU LOOK AT WHAT OCCURRED HERE THE

11  VIDEO SHOWS A SERIES OF EVENTS AND IT STARTS OUT THAT THE

12  VICTIM AND MR. PRATCHARD ARE LOCKED TOGETHER HOLDING ONTO EACH

13  OTHER AND THEY'RE GOING ACROSS THE ROOM AND THEY FALL TO THE

14  GROUND.

15       **THE COURT:**  JUST A MOMENT.  THE VIDEO THAT I GOT DOES

16  NOT SHOW THAT.  MY COPY THAT I WAS SHOWN.  THERE'S A BLUR AND

17  THERE'S THE VICTIM ON THE GROUND GETTING KICKED.

18       **MR. LARKIN:**  I APOLOGIZE, JUDGE.

19       **THE COURT:**  I WOULD LIKE TO HAVE SEEN MORE WHAT

20  HAPPENED, BUT.

21       **MR. LARKIN:**  MY UNDERSTANDING IS RIGHT BEFORE THE

22  VIDEO COMES INTO PLAY THAT IS WHAT HAPPENED.  THE VICTIM AND

23  MR. PRATCHARD WERE HOLDING ONTO EACH OTHER AND THEY TRIPPED

24  OVER A BENCH OR A TABLE AND THEY BOTH FELL ON THE GROUND AND

25  THE VICTIM, ACCORDING TO MR. PRATCHARD, FELL ON TOP OF HIM.

```
 1            AND MR. PRATCHARD PUSHED HIM OFF AND GOT UP AND THAT'S
 2    WHEN YOU SEE HIM KICK THE VICTIM IN THE HEAD.  AND
 3    MR. PRATCHARD IN DEFENSE OF HIS CONDUCT I DON'T THINK AT THE
 4    TIME REALIZED THAT IN THE VIDEO YOU SEE THAT THE VICTIM IS JUST
 5    LYING THERE AND NOT DEFENDING HIMSELF, NOT EVEN ATTEMPTING TO
 6    GET UP.
 7            AND WHAT MR. PRATCHARD HAD DONE, HE HADN'T -- THEY
 8    HELD ONTO EACH OTHER, WHEN HE FELL HE FELL A TOP OF
 9    MR. PRATCHARD, AND MR. PRATCHARD REASONABLY DIDN'T UNDERSTAND
10    WHY HE WASN'T GETTING UP AS QUICKLY.
11            NOT LIKE HE SLAMMED HIS HEAD ON THE GROUND OR HIT HIM
12    IN THE FACE OR ANYTHING TO SUGGEST TO MR. PRATCHARD THAT HE
13    WOULD BE DISABLED, AND ALSO RUNNING THROUGH MR. PRATCHARD'S
14    MIND HE HAD NO IDEA WHERE THE VICTIM FRIEND WAS WHO HE SAYS
15    INITIALLY, INITIATED THE ASSAULT, AND THAT'S APPARENTLY THE
16    PERSON WHO CAME IN AND SAID HE WAS STRUCK BY MR. PRATCHARD
17    ALSO.
18            SO IN HINDSIGHT WHEN YOU SIT THERE AND LOOK AT THE
19    VIDEO IT'S APPARENT THAT THE VICTIM IS NOT DEFENDING HIMSELF,
20    AND I THINK THAT THE REASON HE'S NOT IS BECAUSE OF HIS EXTREME
21    STATE OF INTOXICATION, NOT BECAUSE MR. PRATCHARD HAD PUNCHED
22    HIM PREVIOUSLY OR DONE ANYTHING.
23            THE COURT:  ARE YOU SAYING THAT SOMEBODY WHO HAD THE
24    ABILITY TO TOPPLE MR. PRATCHARD SUDDENLY BECAME SO INTOXICATED
25    HE COULD NOT GET UP?
```

1        IN OTHER WORDS, IN ONE SECOND HE'S GONE FROM A FAIRLY

2   AGGRESSIVE COMBATANT TO SOMEONE WHO INCAPABLE OF GETTING UP

3   BECAUSE HE'S INTOXICATED AS OPPOSED TO BECAUSE HE'S INJURED IN

4   SOME WAY ALREADY?

5        HE'S NOT GETTING UP, THERE'S NOTHING THAT SHOWS HE'S

6   TRYING TO GET UP IN THE VIDEO.  IN OTHER WORDS, THE VIDEO

7   DOESN'T SHOW SOMEONE WHO'S RISING UP AND SOMEBODY WHO'S TRYING

8   TO FIGURE OUT HOW TO KEEP HIM DOWN.  HE'S REALLY JUST FLAT OUT

9   THERE.

10        YES, PEOPLE PASS OUT, BUT NOT UNDER THE CIRCUMSTANCES

11  THAT, I THINK, YOU DESCRIBED OF BEING SORT OF A WORTHY PHYSICAL

12  ADVERSARY, THEN SUDDENLY TURNING TO SOMEONE WHO CAN'T GET UP.

13  ALSO, HIS EYES AREN'T OPEN.  HE'S PRETTY MUCH JUST LYING THERE.

14        OKAY.  THAT'S WHY I SAY I DON'T KNOW WHAT WENT ON

15  BEFORE, APPARENTLY IT'S THREE AGAINST THREE OR WHATEVER IT IS,

16  AND UP UNTIL THE POINT THAT YOU SEE THE KICKING NOBODY SEEMS TO

17  CARE.  ALL RIGHT.

18        IN OTHER WORDS, WHATEVER YOU WERE DESCRIBING AS BEING

19  THIS REAL KIND OF BROUHAHA, NOBODY SEEMED TO HAVE GOTTEN MOVED

20  OUT OF THE WAY, DID ANYTHING.  THEY'RE ALL SITTING THERE

21  DRINKING LIKE NOTHING IS GOING ON AND ALL OF A SUDDEN THE LOOKS

22  AND THERE'S A GUY ON THE GROUND WHOSE GETTING KICK IN THE HEAD,

23  THEN PEOPLE START TO SORT OF PAY ATTENTION.  MAYBE THEY'RE ALL

24  SAUCED TO THE GILLS, I DON'T KNOW.

25        BUT WHATEVER THE STORY IS NOBODY WAS ACTING LIKE, OH,

1    BOY, LOOK AT THIS.  THEY DON'T EVEN LOOK LIKE THEY'RE WATCHING

2    A FIGHT.  IT'S NOTHING.  THEY'RE JUST SITTING THERE DRINKING.

3    SITTING AT THEIR LITTLE TABLES LIKE JUST ANOTHER DAY IN THE

4    PARK FOR THEM.

5         REALLY THE WHOLE THING IS VERY STRANGE, I HAVE TO TELL

6    YOU.  WHAT ISN'T STRANGE, IS WHATEVER HAPPENED TO THE VICTIM

7    ONCE HE'S ON THE GROUND.  THIS IS NOT GOOD, BUT WHATEVER

8    HAPPENED BEFORE IS, AS I SAY, I WASN'T THERE.

9         **MR. LARKIN:**  AND, JUDGE, I NOTICED THE SAME THING THAT

10   YOU DID, THE PEOPLE THAT WERE AROUND, THE SPECTATORS AROUND

11   WEREN'T PAYING MUCH ATTENTION, AND I THINK PART OF THAT MAYBE

12   ATTRIBUTED TO THE FACT THAT WHAT TOOK PLACE INITIATED A LITTLE

13   DISTANCE AWAY AND --

14        **THE COURT:**  WAIT A MINUTE.  HOW WAS IT INITIATED A

15   DISTANCE AWAY?

16        **MR. LARKIN:**  WELL, MY UNDERSTANDING WAS WHEN

17   MR. PRATCHARD AND THE VICTIM LOCKED WITH EACH OTHER THEY MOVED

18   ACROSS THE ROOM A SHORT DISTANCE UNTIL THEY TRIPPED OVER

19   SOMETHING THEN FELL ON THE GROUND.  IT WAS -- I'M NOT SURE HOW

20   FAR THAT WAS, BUT.

21        **THE COURT:**  MAYBE I SHOULD PLAY THE VIDEO AGAIN.  IT

22   DIDN'T LOOK LIKE ANYBODY WAS STANDING UP BECAUSE THEY GOTTEN

23   FALLEN ON OR HAD TO BE OUT OF THE WAY OR ANYTHING LIKE THAT.

24        **MR. LARKIN:**  YOU'RE RIGHT, THEY DIDN'T.

25        **THE COURT:**  IT'S KIND OF LIKE NOTHING HAPPENS UNTIL

```
1    HE'S ON THE GROUND AND IT'S LIKE IT WAS TAKING PEOPLE BY
2    SURPRISE.  YOU'RE DESCRIBING SOMETHING THAT SORT OF SHOULD HAVE
3    CLEARED THE AREA.
4          GOT SIX PEOPLE FIGHTING IN A VERY ENCLOSED PLACE, NOW
5    HOW DOES THAT GO DOWN BETWEEN THESE LITTLE TABLES AND AISLE
6    DOWN THE MIDDLE AND YET EVERYBODY JUST SITTING THERE DRINKING?
7    AS I SAY, THERE'S SOMETHING THAT ISN'T ADDING UP HERE.  I DON'T
8    KNOW WHAT IT IS, BUT.
9          MR. LARKIN:  MY UNDERSTANDING IS THERE WERE LIKE FOUR,
10   ANDREW WHO WAS WITH MR. PRATCHARD AND THE VICTIM AND A
11   GENTLEMAN THAT WAS WITH THE VICTIM.
12         THE COURT:  YOU GOT MR. PRATCHARD AND TWO FRIENDS,
13   HE'S IN THE MIDDLE?
14         MR. LARKIN:  HE'S WITH OTHER PEOPLE.
15         THE COURT:  HE'S WITH TWO OTHER PEOPLE ACCORDING TO
16   HIM, HE'S WALKING DOWN THE AISLE ACCORDING TO HIM AND
17   MR. MCINTIRE, I THINK, BOTH OF THEM THEY'RE ALL WALKING DOWN,
18   THEY'RE GOING TO GO WHEREVER THEY'RE GOING TO GO MINDING THEIR
19   OWN BUSINESS, ALL OF A SUDDEN MR. PRATCHARD REALIZES
20   MR. MCINTIRE NOT WITH HIM, HE TURNS AROUND, GOES BACK AND HE
21   FINDS HIM WITH THESE OTHER PEOPLE AND THEN IT'S PUNCHES, AND
22   WHO KNOWS EVERYBODY SHIRT GRABBING AND WHATEVER GOING ON AND
23   APPARENTLY NOBODY ELSE SEEMED TO THINK THAT WAS VERY
24   INTERESTING.
25         IF IT HAPPENED, CERTAINLY DIDN'T CLEAR THE AREA.  I'D
```

1    GET OUT OF THE WAY IF I SAW SIX GUYS FIGHTING.  I WOULDN'T, AT

2    A MINIMUM, WANT TO BE IN THE LINE OF FIRE, HOPING NOT TO GET

3    BEER ALL OVER ME.

4         WHATEVER HAPPENED HERE THERE'S SOMETHING THAT'S NOT

5    MATCHING THE VIDEO.  IF THE VIDEO IS SHOWING WHAT WAS GOING ON

6    AFTER EVERYTHING CALMED DOWN, THEN THERE'S EVEN LESS REASON TO

7    BE OPERATING IN THE WAY THAT MR. PRATCHARD WAS BECAUSE AT THAT

8    POINT IT'S OVER.  AND SOMEBODY JUST THROWING IN A COUPLE OF

9    GRATUITOUS KICKS.  TRY THAT AGAIN BANG BANG.

10        NOW, AS I SAID, I DON'T KNOW WHAT HAPPENED BEFORE, BUT

11   IT WASN'T A CHAOTIC SCENE AS FAR AS WHAT'S PICKED UP ON THE

12   VIDEO.  OKAY.

13        **MR. LARKIN:**  WELL, I THINK, ACCORDING TO MR. PRATCHARD

14   EVERYTHING HAPPENED VERY QUICKLY.  IN RETROSPECT LOOKING AT THE

15   VIDEO IT WAS, I THINK, SHOCKING TO HIM THAT THE VICTIM HADN'T

16   MOVED OR WHATEVER.  I DON'T KNOW THAT HE REALIZED THAT AT THE

17   TIME.

18        **THE COURT:**  IS IT YOUR THOUGHT THAT IF SOMEONE HAS

19   GOTTEN INTO SOME KIND OF BEAR HUG STRUGGLE WITH YOU, AND I

20   DON'T UNDERSTAND MR. PRATCHARD GOT HURT IN THIS ENCOUNTER IN

21   ANYWAY, DID HE?

22        **MR. LARKIN:**  HE DID NOT.

23        **THE COURT:**  SOMEBODY GETS INTO SOME KIND OF BEAR HUG

24   STRUGGLE WITH YOU, THEY FALL DOWN, THEY'RE GOING TO TRY TO GET

25   UP AND YOU CAN KICK THEM IN THE HEAD?

1      **MR. LARKIN:**  JUDGE, I'M NOT --

2           **THE COURT:**  YOU DON'T HAVE TO RUN FROM THE SCENE, BUT

3      YOU HAVE CERTAIN CHOICES HERE.  YOU CAN'T JUST, YOU CAN'T SHOOT

4      THE PERSON, FOR EXAMPLE, YOU CAN'T HIT HIM OVER THE HEAD WITH A

5      BROKEN BEER BOTTLE.

6           THERE'S A CERTAIN -- YOU GOT TWO, MR. PRATCHARD HAS A

7      RELIGIOUS BACKGROUND, ALL RIGHT, YOU CAN TURN THE OTHER CHEEK,

8      MOST PEOPLE DON'T, OKAY, YOU COULD, YOU COULD GET OUT OF THERE,

9      IF YOU CAN.

10          IF YOU CAN'T, THEN YOU HAVE THE, OBVIOUSLY, A RIGHT TO

11     DEFEND YOURSELF, BUT WITH A REASONABLE AMOUNT OF FORCE AND

12     RESPONSE.

13          AND SO IT CAN ONLY GO SO FAR WHEN YOU'RE TALKING ABOUT

14     WHAT YOU WOULD DESCRIBE AS A DRUNKEN BRAWL WITH OTHER PEOPLE

15     BEING THE DRUNKS AND YOUR CLIENT BEING SOBER BUT.

16          **MR. LARKIN:**  JUST TWO OTHER POINTS.

17          **THE COURT:**  IT IS DEADLY FORCE, IT'S A KIND OF THING

18     WHERE PEOPLE GET BLOOD CLOTS THEY DON'T MAKE IT TO THE

19     HOSPITAL.  SO WE DON'T HAVE A DEAD PERSON, THAT'S FINE, BUT

20     IT'S VERY SERIOUS FORCE, BRAIN DAMAGE, ALL KIND OF THINGS.

21          YOU ONLY HAVE ONE BRAIN, YOU CAN'T PATCH IT UP, YOU

22     CAN'T PUT IT IN A SPLINT, DOESN'T GO AWAY LIKE A BLACK EYE.

23     ANYWAY, I RECOGNIZE THAT EMOTIONS WERE UP.

24          **MR. LARKIN:**  OKAY.  WELL, MOVING ONTO JUST MR. -- THE

25     ONE OTHER THING I WANTED TO SAY, I'M THOUGHT SOMEWHAT TELLING

1    BEFORE I DO THAT IS, I THINK, IT'S SIGNIFICANT THAT AT THE TIME

2    THIS VICTIM WAS NOT THE ONLY PERSON THAT THREATENED

3    MR. PRATCHARD.

4              HE HAD NO IDEA WHERE THE OTHER PERSON WAS AND IT'S NOT

5    LIKE SOMEBODY GRABBED YOU IN A BEAR HUG, THEY WERE -- THERE WAS

6    ANOTHER PERSON WHO HAD STRUCK OUT ACCORDING TO MR. PRATCHARD

7    BEFORE THE VICTIM GRABBED HIM.

8              **THE COURT:**  MR. PRATCHARD SAYS HE GOT HIT IN THE HEAD?

9              **MR. LARKIN:**  RIGHT.

10             **THE COURT:**  I THINK, MR. MCINTIRE CORROBORATING THAT.

11   MS. DOWLING DOESN'T FEEL I SHOULD CONSIDER MR. MCINTIRE'S

12   VERSION OF EVENTS BECAUSE HE HASN'T BEEN SWORN SUBJECT TO

13   CROSS-EXAMINATION, ET CETERA.  TECHNICALLY NEITHER HAS THE

14   VICTIM BEEN SWORN AND SUBJECT TO CROSS-EXAMINATION, WE ONLY

15   KNOW THE FINALITY.

16             **MR. LARKIN:**  AND I SUBMITTED TO THE U.S. ATTORNEY

17   EARLY ON A STATEMENT THAT SELF-DEFENSE WAS GOING TO BE ASSERTED

18   AND THE NAMES OF THE WITNESSES AND WHAT THEY WOULD SAY.  I

19   CAN'T SAY, I THINK, IT'S A BIG SURPRISE THAT AND --

20             **THE COURT:**  SHE'S NOT SAYING THAT.  SHE SAYS, IF YOU

21   WANTED A TRIAL YOU COULD CALL THE PERSON, YOU CAN CROSS-EXAMINE

22   THEM AND FIGURE OUT WHOSE THE BEST HISTORIAN.

23             **MR. LARKIN:**  AS YOU RECALL, ON THE DAY THAT

24   MR. PRATCHARD PLED, I DON'T KNOW IF YOU DO RECALL, BUT HE

25   AGONIZED OVER WHAT TO DO.  WASN'T AN EASY DECISION FOR HIM

1    BECAUSE YOU KNOW IT'S THAT FINE LINE BETWEEN WHERE SELF-DEFENSE

2    ENDS AND, I THINK, WAS NOT AN EASY DECISION.

3            I THINK, THERE WERE FACTORS IN MITIGATION.  I'M NOT

4    TRYING IN ANY WAY JUSTIFY WHAT HE DID, BUT I DON'T BELIEVE IT'S

5    REASONABLE THAT THIS WAS JUST UNPROVOKED ASSAULT.  THAT'S

6    REALLY WHAT I WANT, ALL I REALLY WANT TO SAY ABOUT THE

7    INCIDENT.

8            BEYOND THAT, YOU KNOW, LISTENING, AGAIN, TO THE U.S.

9    ATTORNEY YOU THINK THAT MR. PRATCHARD HAD SOME EXTENSIVE

10   CRIMINAL HISTORY.  HE HAS ONE CRIMINAL CONVICTION WHEN HE WAS

11   IN THE MARINE CORP WHEN HE WAS 19 YEARS OLD.  THAT IS EIGHT

12   YEARS OLD, I BELIEVE, AND IT'S NOT A SERIOUS OFFENSE.

13           BUT IT INVOLVES THE SALES AND DISTRIBUTION OF ECSTASY,

14   WASN'T A LARGE AMOUNT, BUT THE PROBATION REPORT GOES ON FOR

15   THREE PAGES ABOUT ALLEGATIONS OF THREATS OR WHATEVER, THAT WERE

16   NEVER PROVED, WERE DISMISSED AND HE HAS ABSOLUTELY NO

17   CONVICTIONS FOR ANYTHING THAT ALLEGES ASSAULTIVE CONDUCT OR

18   VIOLENCE.

19           YOU KNOW WHAT THEY WERE TALKING ABOUT THERE ARE

20   ALLEGATIONS THAT WERE DISMISSED AND, PERHAPS, SHOULDN'T IGNORE

21   IT.  I DON'T KNOW IT'S APPROPRIATE TO TREAT IT LIKE HE HAS SOME

22   PRIOR CRIMINAL CONVICTION FOR ANY ASSAULTIVE CONDUCT OTHER THAN

23   THAT HE HAS ONE TICKET THAT WENT TO A FAILURE TO APPEAR.

24           HE DOESN'T HAVE AN EXTENSIVE CRIMINAL HISTORY AND THE

25   ONE CONVICTION IS, I THINK, NOT AS PROBATION REPORT SAYS, NOT

1 TOO DISTANT, BUT WAS QUITE AWHILE AGO WHEN HE WAS A YOUNG MAN

2 IN THE MARINE CORP.

3   NOW HE'S A MUCH DIFFERENT PERSON, HE'S GOT A YOUNG SON

4 THAT HE'S CONCERNED ABOUT, THAT HE'S DESCRIBED AS A WONDERFUL

5 FATHER.  I THINK, ANYONE WHO KNOWS HIM WOULD UNDERSTAND THAT.

6   HE'S GOT A GOOD JOB AND I JUST DON'T THINK IT'S

7 REASONABLE FOR FACTS IN THIS CASE TO SEND MR. PRATCHARD TO

8 PRISON WHEN HE'S OTHERWISE A PRODUCTIVE HUMAN BEING THAT, I

9 THINK, DESERVES SOME CONSIDERATION.

10   EVEN IF THERE'S SIGNIFICANT AMOUNT OF RESTITUTION

11 THAT'S ALLEGED IN THIS CASE, THAT SOME OF IT I QUESTION.

12 THERE'S ALMOST $6,500 IN LOST WAGES FOR SOMEONE WHO WASN'T

13 EMPLOYED AT THE TIME THAT THE INCIDENT OCCURRED.

14   HE TALKS ABOUT, PROBATION TALKS ABOUT A LOSS

15 POSSIBILITY OF A JOB OPPORTUNITY AND THEN THERE'S $5,000

16 ALLEGED FOR SURGERY THAT HASN'T TAKEN PLACE IN THE LAST COUPLE

17 OF YEARS.

18   MEDICAL RECORDS IN THIS CASE THAT, I THINK, ARE THE

19 MOST TELLING TALK ABOUT A MILLION DOLLARS DISPLACEMENT BONE

20 FRACTURE ON THE NOSE THAT HASN'T BEEN REPAIRED.

21   **THE COURT:**  THERE'S BEEN NEUROLOGICAL PROBLEMS THAT

22 WERE DESCRIBED BY THE VICTIM AND APPARENTLY SUPPORTED TO SOME

23 EXTENT BY MEDICAL RECORD.

24   IN LOOKING AT MS. SEARLES' RECOMMENDATION SHE IS

25 RECOMMENDING RESTITUTION THAT INCLUDES ALL OF THE CLAIM.  NOW

```
 1    SOME OF THE POINTS THAT YOU MAKE ARE VALID POINTS ABOUT THE

 2    RESTITUTION.  I MIGHT WANT TO ASK MS. SEARLES ABOUT THAT AND

 3    ALSO WHETHER I BELIEVE I HAVE TO FIX A RESTITUTIONARY SUM.

 4            NOW, I DON'T KNOW THAT IT'S SUBJECT TO ANY ADJUSTMENT

 5    LATER, AND YET IF SOMEBODY HASN'T HAD SURGERY I DON'T THINK IT

 6    CAN BE REIMBURSED FOR SURGERY THEY HAVEN'T HAD, ASSUMING THAT

 7    IT'S NOT COVERED BY MEDICAL INSURANCE.

 8            FOR EXAMPLE, WE DON'T HAVE ANY LIEN CLAIMANT HERE,

 9    WE'RE NOT TALKING ABOUT MEDICAL LIEN.  SO I MIGHT WANT TO ASK

10    MS. SEARLES SOME QUESTIONS ABOUT HER CALCULATIONS IN THAT

11    RESPECT.

12            BUT THERE ARE RECORDS FROM A NEUROLOGIST WHO HAD

13    DESCRIBED THE SERIOUSNESS OF THE INJURY, AND MS. SEARLES HASN'T

14    BROKEN DOWN WHAT SHE RELIED ON FOR THE MEDICAL COST, SO -- AND

15    LOST WAGES, I COULD ASK HER THAT FACT.

16            MR. LARKIN:  AND, JUDGE, THERE'S CURRENTLY A PENDING

17    CIVIL CASE BY THE DEFENDANT AGAINST MY CLIENT AND THE PRESIDIO

18    AND THE PARTY THAT PUT ON THE OKTOBERFEST.  I'M FAR LESS

19    CONCERNED ABOUT WHAT THE AMOUNT OF RESTITUTION IS IN THIS CASE

20    THAN I AM ABOUT THE CUSTODIAL STATUS OF MY CLIENT.

21            THE COURT:  WELL, TALKING ABOUT THAT FOR A MOMENT THEN

22    AND, PERHAPS, MORE THAN A MOMENT.  JUST GOING BACK TO THE

23    INJURIES FOR A MINUTE.

24            ACCORDING TO MS. SEARLES THERE WAS A REPORT BY A PARK

25    POLICE OFFICER, THIS IS AT PARAGRAPH SEVEN ON PAGE THREE, AND
```

1  THE POLICE OFFICER SAID HE TOOK PHOTOGRAPHS OF THE, I'M SORRY,

2  THE VICTIM HAD CONTACTED THE OFFICER AND SAID HE TOOK

3  PHOTOGRAPHS OF HIS INJURIES.

4         NOW, I DON'T KNOW IF MS. SEARLES EVER GOT THOSE

5  PHOTOGRAPHS, BUT ACCORDING TO WHAT THE PARAGRAPH SAYS, I DON'T

6  KNOW IF THIS IS COMING FROM A POLICE REPORT OR FROM THE VICTIM,

7  IS THIS FROM THE POLICE REPORT?

8         **THE PROBATION OFFICER:**  YES, IT IS, YOUR HONOR.

9         **THE COURT:**  APPARENTLY, THE OFFICER REPORTED THAT THE

10  VICTIM HAD TWO BLACK AND SWOLLEN EYES AND NUMEROUS CUTS,

11  ABRASIONS AND BRUISING TO HIS HEAD.

12         NOW, IF -- I DON'T KNOW IF ANY OF THAT INJURY IS THE

13  PRODUCT OF WHATEVER HAPPENED.  FIRST, IF IT IS, HE WAS

14  CERTAINLY GETTING THE LOSING END HERE.

15         IF HE WAS TAKING THE LOSING END OF ANY FIGHT, IF THERE

16  WERE A FIGHT, IF HE HAD THAT MANY INJURIES TO HIS HEAD, THEN IT

17  SUGGESTS THERE WERE A FAIR NUMBER OF BLOWS STRUCK TO HIS HEAD

18  IN THAT LAST ENCOUNTER.  IT'S HARD TO TELL.

19         HE DID HAVE A FRACTURED JAW, A BROKEN NOSE AND A

20  CONCUSSION.  HE DID NOT JUST HAVE A DISLOCATED SEPTUM OR

21  SOMETHING OF THAT NATURE.  SO ALSO APPARENTLY HE TOOK --

22  WHOEVER WAS WITH HIM HAD A BLACK EYE ALSO.

23         NOW, PERHAPS, JUST TAKE A MINUTE TO ASK MS. SEARLES.

24  WAS ANY DOCUMENTATION GIVEN TO YOU IN THE FORM OF MEDICAL BILLS

25  THAT TOTALED THE $8,000?

1    **THE PROBATION OFFICER:** YES, YOUR HONOR.  THE VICTIM

2    DID SUBMIT SOME MEDICAL BILLS, NOT ALL, TOTALING THAT AMOUNT,

3    AND COPIES OF THOSE RECORDS WERE FURNISHED TO BOTH THE

4    GOVERNMENT AND TO DEFENSE COUNSEL.

5    I ALSO FURNISHED A COPY TO ALL PARTIES, A COPY OF A

6    LETTER THAT WAS RECEIVED FROM THE VICTIM WHERE I HAD ASKED HIM

7    TO PLEASE PROVIDE SOME PROOF REGARDING HIS LOST WAGES AND HE

8    SUBMITTED A LETTER WHICH I'VE GIVEN TO BOTH COUNSELS AND I'LL

9    FORWARD TO YOUR HONOR.

10   **THE COURT:** OKAY.  REGARDING HIS LOST WAGES.  GIVE

11   THAT TO MS. LUCERO, PLEASE.  HOW MUCH OF THE MEDICAL COST WERE

12   SUPPORTED BY THE DOCUMENTATION?

13   **THE PROBATION OFFICER:** THAT'S NOT AN EASY QUESTION TO

14   ANSWER.  THE MEDICAL RECORDS I ACCEPT SOME WERE DUPLICATE, SOME

15   WERE LISTED AND BILLS WERE NOT ATTACHED.  I DO BELIEVE YOU HAVE

16   A COPY OF WHAT I HAVE.  IT WAS AN ENCLOSURE WITH THE REPORT.

17   **THE COURT:** I DON'T THINK SO.  I THINK, IS THE TAPE,

18   OR THE CD, OR THE VIDEO.  THAT'S ALL I HAVE.  I DON'T HAVE THE

19   DOCUMENTATION.

20   USUALLY I DON'T GET IT.  THERE WOULD BE SOME

21   DESCRIPTION OF WHAT IT WAS, BUT IF THE VICTIM DID PAY THOSE

22   SUMS, DID HE PAY THEM BY CHECK?

23   IS HE JUST BEING BILLED FOR THAT AMOUNT THAT HE HASN'T

24   YET PAID IT?

25   IN OTHER WORDS, HE LAST AN OUTSTANDING OBLIGATION, DID

1    HE EXPLAIN ONE WAY OR THE OTHER?

2         **THE PROBATION OFFICER:**  MY UNDERSTANDING HE HAS PAID

3    THEM AND HIS PARENTS HELPED HIM WITH THE COST OR HE PUT IT ON

4    CREDIT CARDS.

5         **THE COURT:**  HE SHOULD HAVE CANCELED CHECKS FOR ALL OF

6    THAT.

7         **THE PROBATION OFFICER:**  I'VE NOT RECEIVED THOSE.

8         **THE COURT:**  MIGHT WANT TO ASK HIM WHY HE DOESN'T.

9    IF -- AND IF HE STATES HE HAD NO MEDICAL INSURANCE, THEN IT

10   WOULD BE -- THEN THAT WOULD BE A SUM CERTAIN THAT WOULD BE

11   ATTRIBUTABLE TO THE ENCOUNTER.

12        THE LOST WAGES WHAT I HAVE IS A STATEMENT FROM AN

13   EMPLOYER WHO SAID HIS EMPLOYMENT HAD TO BE DELAYED BY REASON OF

14   HIS INJURIES, BUT THERE'S NOTHING IN THAT STATEMENT THAT

15   INDICATES THAT HE WOULD HAVE MADE IN THAT TIME PERIOD.

16        **THE PROBATION OFFICER:**  YOUR HONOR, MAY I SUBMIT THIS

17   DOCUMENTATION THAT HE SUBMITTED TO ME, THAT BOTH PARTIES HAVE,

18   THAT WAS SUPPOSE TO HAVE BEEN INCLUDED WITH THE REPORT.

19        **THE COURT:**  MAYBE IT'S HERE, I'M JUST MISSING IT.  I

20   DON'T SEE ANYTHING BUT A STANDARD REPORT.

21        **THE PROBATION OFFICER:**  I APOLOGIZE, I'M NOT SURE WHAT

22   HAPPENED.

23        **THE COURT:**  I CAN'T SIT HERE START GOING THROUGH THIS

24   NOW TRYING TO FIGURE OUT IN THE FIRST INSTANCE WHETHER IT'S

25   SUPPORTED OR ISN'T, AND SO HOW WOULD I FIGURE THAT OUT?

```
 1            I DON'T KNOW THERE'S A WHOLE THING HERE THAT COMES OUT
 2    TO MEDICAL VISITS WITH A TOTAL OF $8,000.  A GOOD PORTION OF IT
 3    BEING A CT SCAN AND THOSE ARE VERY EXPENSIVE AND CAN BE VERY
 4    COSTLY, SO HE PICKS UP $4,000 JUST TO GET A CT.
 5            I DON'T KNOW THAT WE CAN ADD INTO IT NECESSARILY
 6    POSSIBLE SURGERY, I'M NOT SURE ABOUT THAT.  AND THEN THE LOST
 7    WAGES THAT YOU HAVE, WHERE IS THAT THEN SUPPORTED OTHER THAN --
 8            THE PROBATION OFFICER:  JUST A LETTER, YOUR HONOR.
 9            THE COURT:  THE LETTER DOESN'T STATE A SUM, DOES IT?
10            THE PROBATION OFFICER:  NO, DOES NOT.
11            THE COURT:  HOW DO WE KNOW THAT IT'S $6,000?
12            THE PROBATION OFFICER:  I APOLOGIZE, THE VICTIM HAS
13    INDICATED ON THE FACE SHEET OF THAT DOCUMENT I JUST SUBMITTED
14    TO YOU HOW MUCH HIS EARNINGS WERE PER DAY AT THE BOTTOM OF THAT
15    FORM.
16            THE COURT:  DID YOU CONFIRM THAT WITH THE EMPLOYER?
17            THE PROBATION OFFICER:  I JUST GOT THE LETTER, I'M
18    SORRY, I'VE NOT.
19            THE COURT:  DO YOU USUALLY DO THAT?
20            THE PROBATION OFFICER:  I CAN IF IT'S IN DISPUTE.
21            THE COURT:  I HAVE NO WAY OF KNOWING.  SO IF IT IS
22    NOT, THEN THAT'S FINE.  THERE WAS SOME QUESTION THAT WAS RAISED
23    HERE, BUT IT DOESN'T SOUND LIKE IT WAS A JOB HE DIDN'T GET,
24    SOUND LIKE A JOB HE HAD BEEN OFFERED BUT HAD TO DELAY STARTING.
25            AS I UNDERSTAND IT, AS OPPOSED TO I COULD HAVE HAD A
```

1    JOB BUT I DIDN'T GET IT BECAUSE, WHICH COULD BE DIFFERENT.  LET

2    ME HAND THESE BACK TO MS. SEARLES, JUST SO SHE'LL HAVE THAT FOR

3    REFERENCE IF SHE NEEDS IT.

4            **THE PROBATION OFFICER:**  THANK YOU.

5            **THE COURT:**  GETTING BACK, WHAT ARE YOU RECOMMENDING AS

6    AN APPROPRIATE SENTENCE?

7            **MR. LARKIN:**  JUDGE, WHAT MY PRIMARY CONCERN WITH

8    MR. PRATCHARD IS HE'S GOT A GOOD JOB, WHICH IS NOT AN EASY

9    THING IN THIS DAY'S ECONOMY AND HE'S GOT A YOUNG SON THAT HE'S

10   WANTING TO PROVIDE FOR.

11           THIS IS A CASE THAT'S TWO YEARS OLD.  THERE HAVEN'T

12   BEEN ANY SUBSEQUENT PROBLEMS AND, I BELIEVE, HE POSES NO THREAT

13   TO THE COMMUNITY.  AND I WOULD, YOU KNOW, ASK FOR SOME TYPE OF

14   DISPOSITION THAT WOULD ALLOW HIM TO BE ON ELECTRONIC HOME

15   DETENTION AS OPPOSED TO BEING INCARCERATED IN PRISON.

16           **THE COURT:**  OKAY.  I UNDERSTAND.

17           **MR. LARKIN:**  ONE THING YOU SAID A MINUTE AGO, JUDGE,

18   THAT I WANTED TO ADDRESS IN TERMS OF, I THINK CERTAINLY THE

19   SERIOUSNESS OF THE INJURIES DRIVE WHAT'S HAPPENING, AND I WENT

20   THROUGH ALL THE MEDICAL RECORD THAT WERE PROVIDED INITIALLY

21   WITH THE DISCOVERY, WHICH WERE THE INCIDENTAL REPORTS OF THE

22   MEDICAL TREATMENT THAT THE VICTIM RECEIVED AND THEN THE COPIES

23   OF WHAT PROBATION PROVIDED THAT WAS JUST REFERRED TO, AND

24   NOWHERE DO I SEE ANY DIAGNOSIS THAT THE VICTIM SUFFERED A

25   BROKEN JAW, OR WAS TREATED FOR A BROKEN JAW, OR HAD SURGERY FOR

```
1    A BROKEN JAW.  AND THERE'S THE MEDICAL REPORT TALKED ABOUT A

2    DEVIATED SEPTUM AND NASAL FRACTURE AND THEY DON'T SAY NOTHING

3    ABOUT THAT.

4          THE COURT:  PERHAPS, I SHOULD INQUIRE THE PROBATION

5    OFFICER, SHE IS GETTING THIS INFORMATION FROM THE VICTIM, WHO

6    APPARENTLY TOLD HER HE HAD A FRACTURED JAW AND CONCUSSIONS.

7          IS THERE ANYTHING IN THE RECORDS YOU HAVE,

8    MS. SEARLES, THAT WOULD SUPPORT THAT OR SHOW THAT HE DID?

9          THE PROBATION OFFICER:  YOUR HONOR, THIS WAS

10   INFORMATION THAT THE VICTIM RELAYED TO THE POLICE OFFICER TWO

11   DAYS AFTER THE INCIDENT.

12         THE COURT:  I DON'T HAVE, THE GOVERNMENT APPARENTLY

13   HAD MEDICAL RECORDS SOMEWHERE IN THEIR FILE, WAS THAT RIGHT?

14         MR. DOWLING:  YES, WE PROVIDED THOSE MEDICAL RECORDS

15   TO PROBATION AS WELL.

16         THE COURT:  AND ACCORDING TO PROBATION IT SAYS THE

17   VICTIM WAS DIAGNOSED WITH A NASAL BONE FRACTURE AND HE DID HAVE

18   TO GO UNDER GENERAL ANESTHESIA AND THERE ISN'T ANY REFERENCE

19   THERE TO THE FRACTURED JAW.

20         MR. LARKIN:  JUDGE, IN THE GENERAL ANESTHESIA MY

21   UNDERSTANDING WOULD BE REQUIRED IF ANY MEDICAL PROCEDURE WERE

22   UNDERTAKEN TO CORRECT THAT, WHICH HAS NEVER BEEN DONE.

23         THE COURT:  SORRY?

24         MR. LARKIN:  GENERAL, YEAH, HE NEVER RECEIVED GENERAL

25   ANESTHESIA FROM THE EMERGENCY ROOM STAFF WHEN HE WAS TREATED
```

1   AND RELEASED THE DAY THAT THIS OCCURRED.

2         **THE COURT:**  I SEE, THEY'RE SAYING IF YOU WANT TO

3   CORRECT ANY DISPLACEMENT YOU WOULD TO GO UNDER GENERAL

4   ANESTHESIA AND HAVE SPECIAL SURGERY DONE.

5         **MR. LARKIN:**  THAT'S HOW I INTERPRETED THAT.

6         **THE COURT:**  I THINK, YOU MAYBE RIGHT.

7         **MR. LARKIN:**  AND, JUDGE, IF I COULD JUST INTERJECT ONE

8   OTHER THING IN TERMS OF THE VICTIM'S HEADACHES AND THE

9   POSSIBILITY OF CONTRACTING ALZHEIMER OR SOME OTHER PROBLEM

10  LATER DOWN THE ROAD, I THINK, WOULD BE DIFFICULT TO

11  DIFFERENTIATE FROM THIS INCIDENT AND A FIVE OTHER CONCUSSIONS

12  THAT THE VICTIM HAS SUSTAINED THAT HE DISCUSSED WITH PROBATION

13  FROM SPORTS RELATED INJURIES, AS WELL AS BEING INVOLVED IN

14  OTHER PHYSICAL ALTERCATIONS, NONE SUCH AS UNPROVOKED AS THIS

15  WAS.

16        **THE COURT:**  THAT WAS ON PAGE SEVEN?

17        GOING BACK AGAIN FOR A MINUTE JUST TO THIS QUESTION OF

18  RESTITUTION, ISN'T THE PARTIES UNDERSTANDING THAT RESTITUTION

19  IS A SUM THAT IS FIXED AT THE TIME OF SENTENCING?

20        **MR. DOWLING:**  NO, IT'S NOT.  IT'S MY UNDERSTANDING YOU

21  COULD HOLD A SEPARATE HEARING WITH REGARD TO THE ISSUE OF

22  AMOUNT FOR RESTITUTION IF YOU BELIEVE THERE'S NOT ENOUGH IN THE

23  RECORD.

24        I ALSO WANT TO ADD, THE VICTIM IS WILLING TO ADDRESS

25  THE COURT TODAY TO SHARE WITH YOU THE EXTENT OF HIS INJURIES

1   AND MONETARY LOSS RELATED THERETO.

2            **THE COURT:**  MIGHT BE APPROPRIATE.  IT'S NOW 5:00

3   O'CLOCK.  ALSO, THE PROBATION OFFICE IS RECOMMENDING, AT LEAST,

4   TO START WITH A SMALL PAYMENT TOWARD RESTITUTION.  RESTITUTION

5   COULD BE, I SUPPOSE, REDUCED DOWNWARD.  I DON'T KNOW IF YOU CAN

6   REDUCE IT UPWARD, THOUGH, OVER THE COURSE OF ANY TERM.

7            THE FIRST THING, DOES MR. PRATCHARD WISH TO ADDRESS

8   THE COURT?

9            SIR, YOU HAVE A RIGHT TO ADDRESS THE COURT BEFORE ANY

10  SENTENCING AND IF YOU WOULD LIKE TO DO SO YOU MAY DO SO NOW.

11           I DID READ YOUR LETTER AND I'M AWARE THAT YOU ARE OF

12  THE BELIEF THAT THE MATTER WAS NOT STARTED IN ANY WAY BY

13  YOURSELF, BUT RATHER WAS SOMETHING THAT GOT STARTED AND,

14  PERHAPS, DIDN'T END AS APPROPRIATELY AS IT SHOULD AND YOU

15  RECOGNIZE THAT.  YOU DON'T HAVE TO SPEAK IF YOU DON'T WISH TO.

16  IT'S WHATEVER YOU FEEL IS BEST.

17           **MR. LARKIN:**  JUDGE, JUST WANT TO SAY A FEW WORDS.

18           **THE COURT:**  THAT WOULD BE FINE.

19           **THE DEFENDANT:**  FIRST, I WANTED TO START, YOUR HONOR,

20  BY SINCERELY APOLOGIZING TO THE VICTIM.  I KNOW THAT UNDER THE

21  CIRCUMSTANCES THAT WHERE IN THE REPORT IT SEEMS LIKE WHAT I DID

22  WAS MALICIOUS INTENT, BUT IT WASN'T HONESTLY, WAS ONLY GOING TO

23  THE AID OF A FRIEND, HOWEVER MISPLACED THAT IDEA WAS.

24           I DID NOT SEEK, I DID NOT GO THERE WITH THE INTENT OF

25  HAVING A FIGHT, I WENT THERE TO HANG OUT WITH FRIENDS AND HAVE

1    A GOOD TIME.  I'M NOT A MALICIOUS PERSON, I'M NOT A VIOLENT

2    PERSON.

3         YES, I HAVE SOME ISSUES EXPRESSING MY ANGER AND I HAVE

4    TRIED TO SEEK HELP FOR THAT.  THERE'S A LETTER IN THERE FROM

5    THE THERAPIST I WENT AND SAW AND I WOULD ASK THE COURT THAT YOU

6    GUYS WOULD ALLOW ME TO CONTINUE.  THAT I DON'T KNOW IF YOU GUYS

7    PAY FOR THAT OR IF I DO OR WHATEVER IT IS, I DON'T KNOW, BUT I

8    AM VERY INTERESTED IN PURSUING THAT.

9         LIKE WAS SAID IN THE LETTER AND THAT MY LAWYER

10   CONVEYED, I HAVE A 20 MONTH OLD SON THAT MEANS THE WORLD TO ME,

11   AND WHEN THIS HAPPENED HE WASN'T BORN YET.  AND I CAN TELL YOU

12   FROM EXPERIENCE THAT AFTER HE WAS BORN AND I BECAME A FATHER

13   THAT MY OPINION AND VIEW OF THINGS COMPLETELY CHANGED AND THAT

14   I'M NOT THE SAME PERSON I WAS THAT DAY.

15        MY SON IS IN LARGE PART TO THANK FOR THAT, BUT ALSO

16   JUST THE REALIZATION THIS IS NO WAY TO LIVE YOUR LIFE AND I'M

17   APPROACHING AN AGE NOW I NEED TO START ACTING LIKE AN ADULT.

18        THIS IS SOMETHING I COMPLETELY ABSTAINED FROM.  I

19   DON'T GO TO BARS, VERY RARELY DO I EVER GO TO BARS.  IF I DO I

20   DON'T GET TO THE POINT OF INTOXICATION.  I PREFER TO STAY AT

21   HOME NOW.  I HAVE FRIENDS COME OVER WATCH FOOTBALL, WHAT HAVE

22   YOU, I DON'T PUT MYSELF IN THOSE SITUATIONS ANYMORE.

23        AND I TOLD MY FRIEND AS WELL WHEN WE GO OUT, I SAID I

24   TOLD ALL OF THEM DON'T EXPECT ANYTHING FROM ME, IF YOU GET INTO

25   ANY KIND OF ALTERCATION I'M GOING TO WALK AWAY.  I HAVE TOO

1  MUCH TO LOSE.  A GOOD JOB, A HOUSE, A CHILD, IT'S NOT WORTH IT

2  AND I REALIZE THAT NOW AND I DIDN'T REALIZE THAT THEN, BUT I DO

3  NOW AND THIS IS SOMETHING THAT WILL NEVER EVER HAPPEN AGAIN.

4        **THE COURT:**  THANK YOU.

5        MS. DOWLING, DID YOU WISH TO INQUIRE WHETHER THE

6  VICTIM OF THIS MATTER WANTED TO SAY ANYTHING, JUST AS LAST

7  INQUIRY?

8        **MR. DOWLING:**  YES, YOUR HONOR.  THANK YOU.

9        **THE COURT:**  WHY DON'T YOU GO BACK AND FIND OUT.

10       **MR. DOWLING:**  I ASKED HIM, HE DID WANT TO.

11       **THE COURT:**  SIR, WOULD YOU COME FORWARD.  WE COULD

12  HAVE YOUR NAME?

13       **MR. SANDERS:**  DERRICK SANDERS.

14       **THE COURT:**  MR. SANDERS, WHAT WOULD YOU LIKE TO SAY,

15  SIR?

16       **MR. SANDERS:**  WELL, UNTIL TODAY I DID NOT EVEN KNOW

17  WHAT MR. PRATCHARD LOOKED LIKE, AND SO I DO NOT KNOW THE MAN

18  THAT HE IS.  AND SO THAT DAY HONESTLY CHANGED MY LIFE AND I

19  THINK THAT I WENT THERE WITH THE SAME PURPOSE AS MR. PRATCHARD,

20  AND THAT WAS TO ENJOY MY TIME WITH MY FRIEND AND HAVE FUN.

21       I DO NOT HONESTLY REMEMBER ANYTHING, WHAT HAPPENED.  I

22  REMEMBER BEING THERE AND I REMEMBER WAKING UP IN THE HOSPITAL

23  AND THAT'S ALL I REMEMBER.

24       SO I THINK THAT BEING A MAN THAT IS YOUNGER EVERYBODY

25  FEELS TESTOSTERONE AND THINGS HAPPENED AND HAVE HAD ALTERCATION

1   BEFORE BUT NEVER TO THIS EXTENT.  SO, I THINK, THAT -- I THINK,

2   MR. PRATCHARD JUST MADE A MISTAKE.

3            I HAVE -- I DON'T KNOW WHO HE IS, I DON'T KNOW WHAT

4   HE'S ABOUT AND SO I THINK THAT WHAT HAPPENED WAS THINGS GOT OUT

5   OF HAND AND HE TOOK IT TO THE NEXT LIMIT.

6            I HAVE INJURY ON THE BACK OF MY HEAD AND JAW, WASN'T A

7   BROKEN JAW, ACTUALLY, A BRUISE FROM THE MEDICAL REPORTS FROM

8   THE DOCTOR, AND SO IT ESCALATED TO THE POINT WHERE SEVERE

9   INJURY HAPPENED.

10           THAT BEING SAID, I CAN UNDERSTAND, I UNDERSTAND HE'S

11  VERY APOLOGETIC.  I DO ACCEPT HIS APOLOGY.  IT'S AFFECTED MY

12  LIFE.  I'M GOING TO HAVE TO DEAL WITH THIS.  I STILL DEAL WITH

13  IT EVERY SINGLE DAY AND I DO ACCEPT HIS APOLOGY AND HOPEFULLY

14  THIS TYPE OF THING NEVER HAPPENS AGAIN AND THAT'S IT.

15           **THE COURT:**  THANK YOU VERY MUCH.  OKAY.  SO THEN THE

16  QUESTION IS WHETHER THERE IS ANYTHING FURTHER THAT ANY PARTY

17  WISHES TO CONVEY TO THE COURT?

18           **MR. DOWLING:**  I WOULD SAY JUST ON THE RESTITUTION

19  ISSUE, THAT CAN BE DETERMINED AT A LATER DATE IF NEED BE, NOT

20  TO EXCEED 90 DAYS AFTER SENTENCING.  THAT'S UNDER 18 USC

21  3664(D)(5).

22           ALSO, ON THE SAME LINES FOR RESTITUTION, THE COURT CAN

23  ORDER THE DEFENDANT TO PAY RESTITUTION IN THE AMOUNT FOR

24  MEDICAL COST THAT ARE NECESSARY AS WELL.

25           **THE COURT:**  I'M SORRY, WOULD YOU SAY THAT AGAIN?

1      **MR. DOWLING:**  THE COURT CAN ORDER THE DEFENDANT TO PAY

2   AS PART OF RESTITUTION FOR MEDICAL COST THAT ARE NECESSARY.

3          **THE COURT:**  YOU MEAN, IN THE FUTURE?

4          **MR. DOWLING:**  AND FOR THAT I'M SPECIFICALLY TALKING

5   ABOUT THE SURGERY THAT HAS BEEN DEEMED MEDICALLY NECESSARY FOR

6   HIS NOSE.

7          **THE COURT:**  I'M ASKING YOU HAVE SOME AUTHORITY FOR

8   THAT?

9          **MR. DOWLING:**  YES.

10         **THE COURT:**  FUTURE MEDICAL EXPENSE?

11         **MR. DOWLING:**  CORRECT.  THEN IN THE FUTURE ANYTHING

12  ELSE COMES UP THE VICTIM CAN COME TO THE COURT AND ASK FOR AN

13  AMENDED RESTITUTION AMOUNT, THAT'S FOR SOMETHING DISCOVERED

14  LATER THAT'S RELATED.

15         **THE COURT:**  WHAT ARE YOU RELYING ON FOR THE AUTHORITY

16  THAT A FUTURE PROCEDURE AS, AT LEAST, CONTEMPLATED CAN BE PUT

17  IN THE RESTITUTION SUM?

18         **MR. DOWLING:**  I'M LOOKING AT 3663 AND THIS WOULD BE A

19  I'M SORRY (B)(2)(A).  AND IT STATES, THAT IN THE CASE OF

20  OFFENSE RESULTING IN BODILY INJURY TO A VICTIM, INCLUDING

21  OFFENSE UNDER CERTAIN CHAPTERS, PAY AN AMOUNT EQUAL TO THE COST

22  OF, IF NECESSARY, MEDICAL RELATED PROFESSIONAL SERVICES AND

23  DEVICE RELATING TO PHYSICAL, PSYCHIATRIC AND PSYCHOLOGICAL

24  CARE, AND IT GOES ON FROM THERE.

25         **THE COURT:**  LET ME LOOK AT IT.  THE SECTION AGAIN IS?

```
1          MR. DOWLING:  18 USC 3663.

2          THE COURT:  AS YOU WERE READING IT WENT BY REAL FAST.

3          MR. DOWLING:  SORRY.

4          THE COURT:  LET ME GO BACK AND SEE IF I AGREE WITH

5     YOU.  WHICH PORTION OF IT?

6          MR. DOWLING:  SO THIS WOULD BE, IT'S LITTLE B AND

7     SECTION 2 BIG A.

8          THE COURT:  DOESN'T REALLY SAY.  I GUESS, IT DOESN'T

9     ANSWER MY QUESTION.  LET ME JUST SEE HERE.  IT'S ALL IN THE

10    PAST TENSE THERE, BUT THEN THE NEXT AMOUNT IS PHYSICAL AND

11    OCCUPATIONAL THERAPY AND REHABILITATION AND LOST INCOME.  ALL

12    RIGHT.

13          IS THE MATTER SUBMITTED?

14          MR. LARKIN:  YES.

15          MR. DOWLING:  YES, YOUR HONOR.

16          THE COURT:  I THINK, THIS IS A DIFFICULT ISSUE.  THE

17    BEHAVIOR IS EXTREMELY SERIOUS.  IT IS NOT QUITE THE SAME, AS

18    BEST AS I CAN TELL, OF SOMEBODY THAT GOES OUT ESSENTIALLY

19    ATTACKING PEOPLE, FOR EXAMPLE, AT A BUS DEPOT OR SOMETHING LIKE

20    THAT, SO THEY CAN GET THEIR RADIO OR WHATEVER ELSE.

21          THERE'S SOMETHING THAT HAPPENED HERE AND IT DISTURBS

22    ME, I DON'T KNOW WHAT IT IS.  ALL RIGHT.  I DID SEE THE LATTER

23    PART OF THE ENCOUNTER AND IT IS VERY SERIOUS BEHAVIOR, AND AS

24    MR. SANDERS SAYS IT'S SOMETHING HE'S GOING TO LIVE WITH FOR THE

25    REST OF HIS LIFE.  HE HAS TO DEAL WITH IT.
```

1    THE AMOUNT OF TIME THAT MR. PRATCHARD SERVES, WHATEVER

2  IT IS AND WHERE HE SERVES IT IS NOT GOING TO CHANGE THE AFFECT

3  ON MR. SANDERS.

4    IN OTHER WORDS, MR. SANDERS IS UNFORTUNATELY GOING TO

5  HAVE TO FACE MEDICAL REPERCUSSIONS AND EVEN IF HE DOESN'T HE'S

6  ALSO GOING TO BE WORRIED ABOUT IS SOMETHING GOING TO HAPPEN.

7    HE'S ALSO WAITING FOR THE OTHER SHOE TO DROP, HE

8  DOESN'T KNOW, AND WE ALL ARE VERY PROTECTIVE OF THAT ONE VERY

9  LIMITED GIFT THAT WE HAVE WHICH IS YOUR MIND, AND IF IT'S

10  DAMAGED IN ANY WAY THERE ISN'T A LOT OF TIME FOR IT TO COME

11  BACK, SERIOUS BEHAVIOR.

12    AND, FRANKLY, IF THIS WERE NOT OF THE NATURE IT WAS,

13  MR. PRATCHARD WOULDN'T BE HERE FACING THE KIND OF CHARGE HE IS

14  AND THE KIND OF RECOMMENDATION THAT'S BEING MADE BY THE

15  GOVERNMENT.

16    A LOT OF PEOPLE GET INTO FIGHTS AND THEN THEY GET

17  PROBATION AND MAYBE LITTLE TIME IN A COUNTY FACILITY AND THAT'S

18  IT.  SO WHAT TOOK IT OUT OF THE ORDINARY WAS THE HEAD INJURY

19  AND THE KICKING.

20    NOW, THE EVENT AS POINTED OUT BY DEFENDANT'S COUNSEL

21  HAPPENED SOME TIME AGO.  A YEAR WENT BY BEFORE MR. PRATCHARD

22  WAS CHARGED AND THEN ALMOST IMMEDIATELY HE WAS ARRESTED ON IT.

23    IT ISN'T LIKE THEY WAITED AFTER THAT, BUT EITHER TO

24  INVESTIGATE THE MATTER, OTHERWISE ABOUT A YEAR WENT BY BEFORE

25  THE CHARGES WERE ACTUALLY BROUGHT AND THEN A YEAR HAS BEEN

1  SPENT IN THE MATTER.

2          THIS IS ALSO A CONCERN TO A SENTENCING COURT, IF

3  SOMEONE HAS MANAGED TO GET THEIR LIFE ON TRACK AND THEN DO YOU

4  WANT TO DERAIL IT?  SO THAT'S A CONSIDERATION AS WELL.

5          THE COURT IS BEING ASKED TO IMPOSE A SENTENCE WHICH

6  THE DEFENSE IS REQUESTING, IS NOT ON THE GRID, A GRID BEING THE

7  SENTENCING GUIDELINES.

8          IN OTHER WORDS, THEY WANT A SENTENCE THAT IS NOT

9  RECOMMENDED BY THE GUIDELINES THAT ARE ADOPTED BY THE

10  SENTENCING COMMISSION, THAT GUIDELINE RANGE IS 27 TO 33 MONTHS.

11          AND, ALTHOUGH, THE GOVERNMENT IS RECOMMENDING 33

12  MONTHS, 27 OR 33 IS GOING TO BE VERY DISRUPTIVE IN THE SENSE OF

13  WHATEVER HAPPENS WITH MR. PRATCHARD.

14          MR. PRATCHARD IS RECOMMENDING THAT I LOOK TO THE

15  SENTENCING FACTORS UNDER 3553 AND DETERMINE THOSE SHOULD TRUMP

16  THE SENTENCING GUIDELINES, ESSENTIALLY.

17          NOW, I DON'T HAVE TO IMPOSE A GUIDELINE SENTENCE, IT

18  IS NOT PRESUMED TO BE THE SENTENCE, IT IS A SENTENCE THE COURT

19  HAS TO GIVE SERIOUS CONSIDERATION TO AND I CERTAINLY HAVE AND

20  AM CONSIDERING.

21          I'M ALSO CONSIDERING WHETHER IT WOULD BE APPROPRIATE

22  FOR HIM TO RECEIVE A SENTENCE THAT PROVIDES FOR COMMUNITY

23  CONFINEMENT, NOT NECESSARILY IN HOME DETENTION, WHERE HE COULD

24  CONTINUE TO MAINTAIN HIS EMPLOYMENT, PROVIDE FOR HIS MINOR

25  CHILD AND HAVE HIS LIFE NONETHELESS SIGNIFICANTLY DISRUPTED BY

```
1    THAT KIND OF CONFINEMENT.  IT WOULD NOT BE AS DISRUPTIVE AS

2    BEING IN PRISON.

3           AND ALTHOUGH THERE'S SOME PEOPLE THAT SAY THAT,

4    DEPENDING ON WHAT PRISON YOU GO TO, THEY'RE RATHER PLEASANT

5    PLACES TO BE, EXCEPT FOR THE FACT THAT YOU CAN'T LEAVE AFTER

6    YOU PLAYED YOUR ROUND OF TENNIS.

7           NOW, THE POINT I THINK HERE IS, WHAT IS BEST?

8           IN OTHER WORDS, SHOULD THE COURT IMPOSE, AND WE HAVE

9    TO BE A PROBATIONARY SENTENCE WITH A CONDITION OF, FOR EXAMPLE,

10   COMMUNITY CONFINEMENT.  AND IF I DO THAT, IT CAN'T REALLY BE

11   MORE THAN FOR ABOUT A YEAR BECAUSE THEY CAN'T ACCOMMODATE

12   PEOPLE FOR LONG-TERM COMMITMENTS IN COMMUNITY FACILITIES.

13          OR DO I IMPOSE A SENTENCE UNDER THE GUIDELINES, AND IF

14   I IMPOSE A SENTENCE UNDER THE GUIDELINES IT WOULD BE A SENTENCE

15   I WOULD SAY AT MORE TOWARD THE LOWER END BECAUSE I'M GIVING

16   CREDIT TO WHAT HE'S DONE WITH HIS LIFE SINCE THAT POINT.

17          I COULD IMPOSE A SENTENCE THAT'S LESS THAN THE

18   GUIDELINE SENTENCE AND IT WILL STILL BE A PRISON SENTENCE, BUT

19   THAT DOESN'T ACCOMMODATE THE CONCERNS AND INTEREST I HAVE THE

20   OTHER WAY.

21          I APPRECIATE MR. SANDERS COMING IN AND MR. SANDERS IS

22   NOT VINDICTIVE IN HIS ATTITUDE.  HE FEELS VERY, VERY STRONGLY

23   THAT HIS LIFE HAS BEEN SERIOUSLY DISRUPTED.

24          HE ALSO IS WILLING TO EXCEED TO, AT LEAST, ACKNOWLEDGE

25   THAT THERE HAS BEEN SOMETHING THAT HAPPENED HERE THAT WAS
```

```
 1    PERHAPS NOT PART OF THE ORDINARY BEHAVIOR OF MR. PRATCHARD.
 2    AND HE IS IN THE UNFORTUNATE SITUATION NOT REALLY KNOWING
 3    EXACTLY WHAT HAPPENED HIMSELF, WHICH CAN BE A PRODUCT EITHER OF
 4    ALCOHOL CONSUMPTION OR BRAIN INJURY OR BOTH.
 5         ALL RIGHT.  LOT OF PEOPLE WAKE UP FROM A SERIOUS
 6    ACCIDENT OR HEAD INJURY AND HAVE NO IDEA HOW THEY GOT TO WHERE
 7    THEY WERE.  THAT'S NOT BECAUSE THEY WERE DRINKING, BUT IT'S
 8    CONCEDED THERE'S ALCOHOL INVOLVED, SO THAT'S A DILEMMA THE
 9    COURT IS PUT IN.
10         AND I'VE GIVEN IT QUITE A BIT OF THOUGHT.  I REALLY
11    DIDN'T KNOW WHAT I WAS GOING TO DO WHEN I CAME OUT HERE TODAY.
12    I DON'T WANT TO LEAVE YOU ALL JUST DANGLING SAY WHAT SHE GOING
13    TO DO.
14         I DO HAVE THE ABILITY TO DO THIS.  IT'S A DIFFICULT
15    OBLIGATION, IT ISN'T JUST A BENEFIT THE COURT GETS.  HAVING
16    HEARD EVERYTHING, AND I DO THINK MR. PRATCHARD HAS AN ANGER
17    PROBLEM, A LOT OF PEOPLE DO, BUT IT DOESN'T NECESSARILY GET TO
18    THE POINT THIS DID, THAT I'M WILLING TO GIVE HIM THE CHANCE
19    THAT HE'S ASKING FOR TO LEAVE HIM IN THE COMMUNITY, BUT IT'S
20    NOT GOING TO BE ON HOME DETENTION.
21         SO I HOPE I'M NOT PROVED WRONG BY THIS AND I WANT TO
22    SAY TO MR. SANDERS THAT THIS IS NOT IN ANY WAY A MINIMIZATION
23    OF WHAT HAPPENED TO YOU, SIR.
24         WHEN I CAME OUT HERE TODAY I WAS READY TO THROW THE
25    BOOK AT MR. PRATCHARD, BUT I READ A BIT ABOUT WHAT HIS FRIENDS
```

1   HAVE SAID, I READ -- AND I'M NOT GOING TO ABOUT THE EVENT, YOU

2   KNOW MY VIEWS ABOUT THIS EVENT, I'M NOT SATISFIED THAT

3   MR. PRATCHARD'S RECOLLECTION IS SPOT ON, BUT NONETHELESS I'M

4   PREPARED TO GIVE HIM THAT CHANCE.

5           AND I WANT HIM TO KNOW THAT IF HE IN ANY WAY STRAYS

6   WHILE THAT CHANCE IS OUT THERE, THAT'S IT.  I'M TAKING INTO

7   CONSIDERATION THE COLLATERAL DAMAGE VICTIMS, WHICH ARE HIS OWN

8   CHILD AND ANYONE WHO HE'S SUPPORTING.

9           HE HAS GOTTEN HIMSELF A DECENT JOB, AND IT'S A CLOSE

10  CALL, THAT'S GOING TO BE MY RULING.  SO I DO CALCULATE THE

11  GUIDELINES AS DID THE PROBATION OFFICE, I DO NOT DISPUTE IN ANY

12  WAY THAT CALCULATION.

13          PURSUANT TO SENTENCING REFORM ACT OF 1948, IT'S THE

14  JUDGMENT OF THE COURT JOSH PRATCHARD IS HEREBY PLACED ON

15  PROBATION FOR A PERIOD OF THREE YEARS.  AND AS ONE OF THE

16  CONDITIONS OF THAT PROBATION HE IS TO SPEND ONE YEAR IN

17  COMMUNITY CONFINEMENT TO BE DETERMINED BY THE PROBATION

18  OFFICER.

19          WHILE ON THAT TYPE OF COMMITMENT HE IS ALLOWED TO GO

20  TO WORK, MEDICAL APPOINTMENTS, RELIGIOUS SERVICES, BUT -- AND

21  IF FAMILY VISITS CAN BE MAINTAINED IN THAT REGARD THROUGH THE

22  PROBATION OFFICE, I WILL LEAVE THAT TO THEM BECAUSE ONE OF THE

23  REASONS THAT I'M ALLOWING HIM TO STAY IN THE COMMUNITY IS TO

24  KEEP IN CONTACT AND HAVE A RELATIONSHIP WITH HIS MINOR SON.

25          BUT IN THIS INSTANCE THE TRADITIONAL RESTRICTIONS ON

1   MR. PRATCHARD'S LIFE, SO TO SPEAK, WHILE IN COMMUNITY

2   CONFINEMENT, ARE GENERALLY APPLICABLE AND THERE HAS TO BE SOME

3   PUNISHMENT ASPECT HERE.

4          THE LAW REQUIRES THAT I CONSIDER THE SERIOUSNESS OF

5   THE CRIME, THE NEED FOR DETERRENCE, THE CHARACTER AND HISTORY

6   OF THE DEFENDANT, AND THE NEED TO PROTECT THE COMMUNITY, AND I

7   BELIEVE THAT THIS HAS TO BE SERIOUSLY IMPRESSED ALL THE WAY

8   AROUND.

9          THE CONDITIONS OF PROBATION WILL BE VERY SIMILAR TO

10  THOSE THAT ARE RECOMMENDED AS CONDITIONS OF SUPERVISED RELEASE

11  BY MS. RICHARDS.

12         HE'S TO REFRAIN FROM THE UNLAWFUL USE OF ANY

13  CONTROLLED SUBSTANCES.  HE'S TO SUBMIT TO A DRUG TEST IF THE

14  PROBATION DEPARTMENT REQUIRES IT, BUT I DON'T THINK THAT ONCE I

15  HAVE NOT IMPOSED A PRISON TERM THAT HE HAS TO HAVE THAT

16  TESTING.

17         I HAVEN'T ACTUALLY CHECKED THAT.  I WILL JUST SAY,

18  HE'S TO SUBMIT TO ONE DRUG TEST WHILE HE'S ON PROBATION AND TWO

19  PERIODIC TESTS THEREAFTER WHILE HE IS ON PROBATION.  HE'S TO

20  PAY RESTITUTION AND THE COURT WILL ORDER RESTITUTION AS

21  FOLLOWS.

22         I AM ACCEPTING THE VICTIM'S CALCULATION OF HIS LOSS,

23  AND IF AT ANY TIME ANYONE CAN SHOW IT TO BE LESS I WILL

24  CONSIDER REDUCING THE RESTITUTION, BUT I'M GOING TO ACCEPT HIS

25  CALCULATION AND I WILL INCLUDE IT IN THE ESTIMATED COST FOR

1    FUTURE SURGERY AND ANY OTHER MEDICAL EXPENSES THAT MAYBE DEEMED

2    NECESSITATED THAT ARE REASONABLY RELATED TO THIS ENCOUNTER.

3          HOWEVER, I HAVE TO FIX A SUM NOW AND THAT SUM WILL BE

4    AS CALCULATED BY MS. RICHARDS AT $19,516.  NOW, SHE'S ONLY

5    RECOMMENDING THAT THE RESTITUTION BE PAID AT A SMALL AMOUNT

6    BECAUSE SHE UNDERSTOOD THAT MR. PRATCHARD WOULD BE COMMITTED TO

7    FEDERAL PRISON.

8          I DO NOT KNOW HOW MUCH MONEY HE IS ABLE TO PAY TOWARD

9    THE RESTITUTION.  I AM REQUIRED TO FIX A SUM AND I'M GOING TO

10   FIX IT AT $150 A MONTH BECAUSE HE'S ABLE TO WORK ON THE COURT'S

11   ORDER.

12         IF THAT BECOMES EITHER TOO LITTLE OR TOO MUCH, THEN

13   THE PROBATION OFFICE IS TO LET ME KNOW THIS.  THERE IS A CIVIL

14   ACTION AS WELL AND IF A JUDGMENT IS OBTAINED IN THAT CIVIL

15   ACTION IT CAN BE EXECUTED ON INDEPENDENTLY OF AND IN ADDITION

16   TO THIS ORDER.

17         WITH RESPECT TO ALL OF THE OTHER CONDITIONS THAT WOULD

18   APPLY, MR. PRATCHARD IS TO GIVE THE PROBATION OFFICE ACCESS TO

19   FINANCIAL INFORMATION, INCLUDING TAX RETURNS, AND TO ALLOW HER

20   TO CONDUCT CREDIT CHECKS AND OBTAIN COPIES OF THOSE RETURNS.

21         HE IS TO PARTICIPATE IN AN ASSESSMENT AS DEEMED

22   NECESSARY BY THE PROBATION OFFICER, A PROGRAM OF TESTING AND

23   TREATMENT FOR DRUG AND ALCOHOL AND/OR ALCOHOL ABUSE, AND IS TO

24   PAY ALL OR PART OF IT, AND HE MENTIONED COSTS OF ANOTHER TYPE

25   AND I WILL GET TO THAT AS WELL.

1          WITH RESPECT TO THIS TREATMENT, DEPENDING ON HIS

2     ABILITY TO PAY, YOU MAY HAVE TO PAY ALL OR PART OF IT AS

3     DETERMINED BY THE PROBATION OFFICE, BUT NEVER TO EXCEED THE

4     TOTAL COST OF TESTING AND COUNSELING IN THAT REGARD.

5          HE'S ALSO TO PARTICIPATE AS DIRECTED BY THE PROBATION

6     OFFICE IN A MENTAL HEALTH TREATMENT PROGRAM, AND I WOULD SAY

7     WITH A FOCUS ON ANGER MANAGEMENT BECAUSE THAT'S THE ONE AREA

8     THAT HE'S HAD TROUBLE WITH IN PARTICULAR AND TO PAY ALL OR PART

9     OF COST OF THAT TREATMENT, IF HE CAN, AS DIRECTED BY THE

10    PROBATION OFFICER.

11         AGAIN, NEVER TO EXCEED THE TOTAL COST OF THAT

12    COUNSELING, BUT IT MAY BE THAT BY COMING THROUGH THE COURT THE

13    COST MAYBE REDUCED IN SOME FASHION.

14         HE IS SUBJECT TO A SEARCH CONDITION OF HIS PERSON,

15    RESIDENCE, OFFICE, VEHICLE OR ANY PROPERTY UNDER HIS CONTROL,

16    PROVIDED THAT SEARCH IS CONDUCTED BY UNITED STATES PROBATION

17    OFFICER AT A REASONABLE TIME AND IN REASONABLE MANNER BASED

18    UPON REASONABLE SUSPICION OF POSSESSION OF CONTRABAND OR A

19    VIOLATION OF CONDITION OF RELEASE.

20         AND FAILURE TO SUBMIT TO A SEARCH COULD BE GROUND FOR

21    REVOCATION.  HE SHOULD WARN THE RESIDENTS THE PREMISES WILL BE

22    SEARCHED.

23         HE'S NOT TO BE IN THE VICINITY OF DEREK SANDERS, THE

24    VICTIM IN THIS MATTER, OTHER THAN IF THERE WERE REQUIRED COURT

25    APPEARANCE, UNLESS APPROVED BY THE PROBATION OFFICER.

1    AND HE'S TO COOPERATE IN THE COLLECTION OF DNA AS

2    DIRECTED BY THE PROBATION OFFICE.  OF LESS CONCERN I THINK TO

3    EVERYONE BUT STILL REQUIRED IS $100 PENALTY ASSESSMENT IT'S DUE

4    IMMEDIATELY.

5    HE CAN'T PAY IT IMMEDIATELY BECAUSE THE CLERK'S OFFICE

6    IS CLOSED, BUT HE IS TO PAY IT NO LATER THAN TWO WEEKS FROM

7    TODAY.

8    ALL RIGHT.  AND THAT IS TO THE CLERK'S OFFICE IN,

9    MS. RICHARDS CAN TELL HIM WHERE.  I DON'T --

10   **MR. DOWLING:**  MS. SEARLES.

11   **THE COURT:**  I KEEP SAYING MS. RICHARD, I GOT YOU IN MY

12   MIND, ANN SEARLES.  ANN RICHARDS WAS A WONDERFUL PROBATION

13   OFFICER AS WELL AND YOU HAVE MANY OF THE SAME QUALITIES AND I

14   JUST MIX UP THE ANNS.

15   NOW, IS THERE ANYTHING ELSE FROM THE GOVERNMENT OR

16   PROBATION OFFICE'S STANDPOINT?

17   **MR. DOWLING:**  NO.  JUST ONE MOMENT.  YOU MENTIONED

18   THAT THE RESTITUTION BE $150 PER MONTH, MS. SEARLES

19   RECOMMENDATION HE'S OUT OF CUSTODY WOULD BE 250 PER MONTH, DID

20   YOU WANT TO DECREASE THAT AMOUNT?

21   **THE COURT:**  WELL, THE QUESTION WOULD BE WHETHER IF SHE

22   THINKS HE'S IN A POSITION TO PAY THAT WHILE AS LONG AS HE'S

23   RETAINING HIS JOB WITH HIS CURRENT EMPLOYER, THEN I WOULD

24   CONSIDER MAKING IT 250.

25   I DON'T WANT TO PUT TOO MUCH PRESSURE ON HIM IN THAT

1    SENSE.  IT'S GOING TO BE A LONG TIME BEFORE THE VICTIM GETS

2    REPAID, BUT EITHER WAY, I WOULD BE WILLING TO RECONSIDER, SO

3    MAKE IT 250.

4           **THE PROBATION OFFICER:**  IF YOU LOOK AT HIS FINANCIAL

5    STATEMENT, YOUR HONOR, ON PAGE 19 HE STILL HAS A NET MONTHLY

6    CASH FLOW OF $923 AFTER EXPENSES, SO I THINK --

7           **THE COURT:**  HIS EXPENSES MAY OR MAY NOT GO UP WITH

8    SOME OF THE COST OF TREATMENT.  I'LL TELL YOU WHAT I'LL MAKE IT

9    250, BUT IT MAY BE A WASH WITH WHATEVER ENDS UP HAVING TO BE

10   PAID TOWARD TREATMENT.

11          IN OTHER WORDS, I DON'T KNOW IF THIS GOES UP THEN.

12   THE TREATMENT COST MAY GO DOWN, BUT I'D RATHER, FRANKLY, SEE

13   MR. SANDERS GET THE MONEY THAN THE HEALTH CARE FACILITY.  THEY

14   GOT OTHER SOURCES OF INCOME, HE HAS LIMITED INCOME.

15          OKAY.  SO LET ME ASK YOU, MR. LARKIN, SO I AMENDED

16   THAT, MS. LUCERO, TO GO TO 250, BUT IT'S A JUSTIFIABLE IF IT

17   TURNS OUT IT'S TOO MUCH.

18          MR. LARKIN.

19          **MR. LARKIN:**  DO I HAVE ANY QUESTIONS?

20          **THE COURT:**  YES.  ANYTHING FURTHER?

21          **MR. LARKIN:**  WELL, THE ONE ISSUE THAT YOU HAVEN'T

22   ADDRESSED IS COULD THERE BE SOME DELAY OF ANY REPORT DATE TO

23   CUSTODY?

24          **THE COURT:**  OF COURSE, IT ISN'T THE SAME AS A PRISON

25   COMMITMENT WHERE ORDINARILY SOME WOULD BE -- WOULD BE REMANDED

1   OR A STAYED SURRENDER.

2           IN THIS INSTANCE MS. SEARLES IS GOING TO HAVE TO

3   DETERMINE A VACANCY AND WHEN IT'S AVAILABLE.  THEY DON'T HAVE

4   THAT MUCH ROOM ALL THE TIME.

5           IF YOU WERE ASKING IRRESPECTIVE WHEN A BED BECOMES

6   AVAILABLE HE'D LIKE TO HAVE A LITTLE TIME TO JUST GET THINGS IN

7   ORDER, HOW MUCH TIME ARE YOU ASKING?

8           **MR. LARKIN:**  JUDGE, ONE OF THE THINGS I WAS

9   CONSIDERING WAS THAT WE'RE JUST COMING UP TO THE HOLIDAYS,

10  THANKSGIVING AND FOLLOWED BY CHRISTMAS.  SO I WAS GOING ASK IF

11  IT WAS POSSIBLE TO START IT ON THE FIRST OF THE YEAR, WHICH IS

12  LESS THAN 90 DAYS FROM NOW.

13          **THE COURT:**  WHAT'S THE POSITION OF THE PROBATION IN

14  THAT RESPECT AND HOW THAT CREATES PROBLEMS OR DOESN'T FOR YOU?

15          **THE PROBATION OFFICER:**  IF YOU IMPOSE THE ORDER OUR

16  PHILOSOPHY IS TO MOVE THEM IN THE HALFWAY HOUSE AS SOON AS

17  POSSIBLE TO SERVE HIS SENTENCE.

18          **THE COURT:**  YOU HAVE TO MAKE ARRANGEMENTS FOR HIM TO

19  HAVE A PLACE?

20          **THE PROBATION OFFICER:**  WE CAN'T DO THAT OVERNIGHT, WE

21  WILL REQUIRE SOME TIME, BUT WE CAN GET IT DONE WITHIN A

22  RELATIVELY SHORT PERIOD OF TIME.

23          **THE COURT:**  WHAT WOULD THAT BE?

24          **THE PROBATION OFFICER:**  I WOULD SAY, A WEEK OR TWO.

25          **THE COURT:**  LET ME ASK YOU ONE OTHER QUESTION IN THAT

```
 1   RESPECT.  ARE THERE ANY -- IS ANY ARRANGEMENT CAPABLE OF BEING
 2   MADE BY YOUR OFFICE OR BY MY ORDER HE BE ALLOWED TO SPENT, FOR
 3   EXAMPLE, CHRISTMAS EVE AND DAY WITH HIS FAMILY, THANKSGIVING
 4   WITH HIS FAMILY?
 5            THE PROBATION OFFICER:  YOU COULD MAKE THAT ORDER,
 6   YOUR HONOR.
 7            THE COURT:  OKAY.  I WILL ORDER HIM TO, ALL RIGHT, AS
 8   DIRECTED BY THE PROBATION OFFICE, BUT WE'LL ALSO ORDER HE BE
 9   ALLOWED TO SPEND THANKSGIVING DAY AND CHRISTMAS EVE STARTING AT
10   4:00 O'CLOCK AND THROUGH THE NEXT DAY TO, I'M NOT SURE WHEN THE
11   TIME IS THAT THEY HAVE PEOPLE COME, WHAT THEIR CURFEW HOUR, IF
12   THEY HAVE ONE.
13            THE PROBATION OFFICER:  I DON'T KNOW.
14            THE COURT:  9:00 O'CLOCK CHRISTMAS DAY.  OKAY.  SO
15   4:00 O'CLOCK CHRISTMAS EVE TO 9:00 O'CLOCK CHRISTMAS DAY HE CAN
16   SPEND WITH HIS FAMILY.
17            MR. LARKIN:  THE ONE -- I KNOW THE ONE CONCERN
18   MR. PRATCHARD HAS IS HE'S GOT HIS LIVING ARRANGEMENT IN HIS
19   HOUSE TO MOVE OUT, PUT ALL OF HIS STUFF INTO STORAGE.  IS A
20   COMPLICATED SITUATION AND EVEN IF IT COULD BE 30 DAYS THAT
21   WOULD ENABLE HIM TO DEAL WITH HIS OBLIGATIONS AS FAR AS I'M --
22            THE COURT:  DOES HE HAVE TO MOVE OUT?  COULD HE RENT?
23            MR. LARKIN:  WELL, I DON'T THINK HE'S GOING TO BE ABLE
24   TO AFFORD TO CONTINUE TO PAY THE RENT THERE IF HE'S NOT GOING
25   TO LIVE THERE FOR THE NEXT YEAR.
```

1       THE COURT:  BUT HE'S GOING TO BE WORKING?  THAT'S THE

2  WHOLE POINT.

3       MR. LARKIN:  I'M WASN'T SURE WHETHER HIS

4  ACCOMMODATING, HE'S GOING TO HAVE TO PAY ANYTHING FOR HIS

5  ACCOMMODATION.

6       THE COURT:  WHAT'S THE RULE ON COMMUNITY CONFINEMENT?

7       THE PROBATION OFFICER:  YOUR HONOR, I THINK WHAT

8  WE'LL -- THEY'LL DO IS LOOK AT HIS INCOME AND BASE THE RENT ON

9  HIS INCOME.

10      THE COURT:  AT THE COMMUNITY CONFINEMENT FACILITY?

11      MR. LARKIN:  YES.

12      THE PROBATION OFFICER:  YES.

13      THE COURT:  ALL RIGHT.  I'M GOING TO GIVE HIM A COUPLE

14  OF WEEKS TO TRY AND GET THOSE AFFAIRS IN ORDER.  THAT WILL

15  COINCIDED PRETTY MUCH WITH MS. RICHARDS' ESTIMATE, MS. SEARLES

16  ESTIMATE, IN ANY EVENT.

17      SO, I THINK, THAT IF I GIVE HIM A STAY NOT TO HAVE TO

18  GO TO THE FACILITY FOR A COUPLE OF WEEKS.  SO TODAY IS THE

19  21ST, SO SURRENDER NO EARLIER THEN 4TH AND TO DO SO AT THE

20  DIRECTION OF THE PROBATION OFFICE.

21      NOW, IF WE STAY OUT HERE ANY LONGER, MR. LARKIN, I MAY

22  CHANGE MY MIND.

23      MR. LARKIN:  JUDGE, I APPRECIATE YOUR GOING PAST THE

24  HOUR.

25      THE COURT:  OKAY.  JUST IT'S NOT THAT WE JUST BEEN AT

1    IT FOR QUITE AWHILE.  SO WE CAN ONLY FINE TUNE THIS SO MUCH.

2            MS. SEARLES IS I'M SURE GOING TO TALK TO YOUR CLIENT

3    AND YOURSELF, IF THERE PARTICULAR CONCERNS THAT YOU HAVE AND TO

4    DEAL WITH THEM.  I REALLY DON'T HAVE ANYMORE TO SAY.

5            I WISH MR. SANDERS GOOD LUCK.  I HOPE THAT YOUR HEALTH

6    WILL IMPROVE AND CONTINUE TO AND I DO WISH MR. PRATCHARD

7    CONTINUED SUCCESS WHILE HE'S ON PROBATION AND WANT YOU TO KNOW

8    I'LL BE HERE IF HE'S NOT SUCCESSFUL.  OKAY.

9            **MR. LARKIN:**  THANK YOU.

10           **MR. DOWLING:**  THANK YOU.

11

12                     (PROCEEDINGS ADJOURNED.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS WERE REPORTED BY ME, A CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS.

I FURTHER CERTIFY THAT I AM NOT OF COUNSEL OR ATTORNEY FOR EITHER OR ANY OF THE PARTIES IN THE FOREGOING PROCEEDINGS AND CAPTION NAMED, OR IN ANY WAY INTERESTED IN THE OUTCOME OF THE CAUSE NAMED IN SAID CAPTION.

THE FEE CHARGED AND THE PAGE FORMAT FOR THE TRANSCRIPT CONFORM TO THE REGULATIONS OF THE JUDICIAL CONFERENCE.

FURTHERMORE, I CERTIFY THE INVOICE DOES NOT CONTAIN CHARGES FOR THE SALARIED COURT REPORTER'S CERTIFICATION PAGE.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS 21ST DAY OF SEPTEMBER, 2010.

/S/   JAMES YEOMANS

_____

JAMES YEOMANS, CSR, RPR